**Donald G. RICE and Jacqueline Rice, Appellants,**

v.

**T. Russell STRUNK, Jr., Thomas Gallmeyer, Rothberg, Gallmeyer, Fruechtenicht & Logan, and Indiana partnership, Appellees.**

**No. 57S03–9504–CV–428.**

Supreme Court of Indiana.

Aug. 6, 1996.

---

John Muller, Timothy J. Kennedy, Miller, Muller, Mendelson & Kennedy, Indianapolis, for Appellants.

Leonard E. Eilbacher, Carla J. Baird, Hunt, Suedhoff, Borror & Eilbacher, Fort Wayne, for Appellees.

Constance Sara Hepburn, Indianapolis, for Amicus Curiae W. William Hodes.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

This case requires us to rule upon the duty of a lawyer for a general partnership to a partner thereof in certain circumstances.

### Background

Harold J. Belkin, Steven M. Cobin, and Donald G. Rice executed a partnership agreement on February 21, 1985, creating a California general partnership, the Oak Lawn Courts Partnership, for the purpose of owning and managing the Oak Lawn Courts Apartments in Fort Wayne, Indiana. The partnership agreement designated Cobin as the managing partner. At the same time that the partnership agreement was executed, the partnership entered into a Real Property Management Agreement with Rice and his wife for the purpose of managing and leasing the Oak Lawn Courts Apartments. This agreement provided that either the partnership or the Rices could, upon seventy-two hours notice, terminate it for cause.

The law firm of Rothberg, Gallmeyer, Fruechtenicht & Logan represented the partnership for various purposes. In addition, the firm provided personal legal counsel

to the Rices at various times during 1984 and 1985. However, in 1985, following a partnership dispute resolved against him, Rice removed all of his files from the Rothberg firm and ceased using it as his personal counsel.

On March 24, 1987, the partnership refinanced the Oak Lawn Courts apartment complex. The refinancing required a loan of $2,300,000 and was personally guaranteed by each of the three partners. The Rothberg firm represented the partnership in connection with the refinancing. Rothberg associate T. Russell Strunk and Rice attended the closing on behalf of the partnership.

Several months before the closing, Cobin began talking to Strunk about Strunk replacing the Rices as the property manager for Oak Lawn Courts. On March 15, 1987, Strunk accepted an offer to this effect. Three days later, Strunk informed his law firm that he would be leaving the firm to manage the apartments. Rice was not aware of any of these discussions and, in fact, Cobin specifically instructed Strunk not to tell Rice of these developments until after the closing of the refinancing. Cobin and Belkin were certain that Rice would not agree to participate in the refinancing if Rice knew that his property management position was in jeopardy. Two months after the closing, Cobin notified the Rices that their management contract was terminated and that Strunk would thereafter manage the apartments.

Litigation followed in both federal and state court. In this case, the Rices seek damages from the Rothberg firm, Rothberg partner Thomas M. Gallmeyer, and Strunk for "material misrepresentation of facts," "breach of fiduciary duties," "breach of duty to evaluate legal and ethical responsibilities," and "conspiracy to defraud plaintiffs or to breach fiduciary duties." The trial court entered findings of fact and conclusions of law, rendered summary judgment in favor of defendants, and dismissed the complaint. The Court of Appeals affirmed. *Rice v. Strunk,* 632 N.E.2d 1151 (Ind.Ct.App.1994).

### Discussion

### I

We begin by addressing three preliminary matters. First, the defendants contend that the plaintiffs' claims are subject to the two-year statute of limitations that applies to legal malpractice actions, Indiana Code § 34-1-2-2, and that the plaintiffs failed to file timely their claims. The Court of Appeals agreed that the two-year statute of limitations applied here but found that the plaintiffs' claims were filed within the two-year limit. *Rice,* 632 N.E.2d at 1154. For purposes of deciding this appeal on the merits, we will assume the correctness of the Court of Appeals resolution of this issue.

Second, as noted above, plaintiffs' complaint sought damages as a result of defendants' alleged material misrepresentation of facts, breach of fiduciary duties, breach of duty to evaluate legal and ethical responsibilities, and conspiracy to defraud plaintiffs or to breach fiduciary duties. As this litigation has progressed, the parties seem to agree that the complaint alleges (i) attorney malpractice, (ii) actual fraud, and (iii) constructive fraud. We agree that this is the proper way to analyze plaintiffs' claims.

 Third, in granting the motion for summary judgment, the trial court entered findings of fact and conclusions of law. We note that normally the requested entry of specific findings and conclusions triggers the appellate standard of review contained in Indiana Trial Rule 52. However, that rule governs only those cases which proceed to trial, not those cases disposed of in summary proceedings. *PMS, Inc. v. Jakubowski,* 585 N.E.2d 1380, 1381 n. 1 (Ind.Ct.App.1992). The entry of specific findings and conclusions does not alter the nature of a summary judgment which is a judgment entered when there are no genuine issues of material fact to be resolved. *Id.* Thus, in the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions of law. They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.* Hence, we employ our usual standard of review for cases disposed of by summary judgment.

### II

 The elements of attorney malpractice are: (i) employment of an attorney which

creates the duty; (ii) the failure of the attorney to exercise ordinary skill and knowledge (the breach of the duty); and (iii) that such negligence was the proximate cause (iv) of damage to the plaintiff. ˙ *Fiddler v. Hobbs,* 475 N.E.2d 1172, 1173 (Ind.Ct.App.1985). The elements of constructive fraud are: (i) a duty owing by the party to be charged to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Pugh's IGA, Inc. v. Super Food Services, Inc.,* 531 N.E.2d 1194 (Ind.Ct.App.1988), *trans. denied.* As such, plaintiffs' claims for both attorney malpractice and constructive fraud depend upon the existence of a duty running from defendants to plaintiffs. In the absence of such a duty, plaintiffs cannot recover under either theory. *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind. 1991).

■ Plaintiffs contend that defendants' duty was the fiduciary obligation an attorney owes to the attorney's client. Specifically, plaintiffs argue that the attorney-client relationship between Strunk and his law firm and the partnership extended to Rice as a general partner, giving rise to the fiduciary obligation. Ordinarily, whether the law recognizes any duty on the part of a particular defendant to conform the defendant's conduct to a certain standard for the benefit of the plaintiff requires that three factors be balanced: (i) the relationship between the parties, (ii) the reasonable foreseeability of harm to the person injured, and (iii) public policy concerns. *Webb v. Jarvis,* 575 N.E.2d at 995.[1] However, because it is necessary in this case for the plaintiffs to show the existence of an attorney-client relationship, the existence of duty will turn initially on the relationship of the parties.[2] That is, if an attorney-client relationship does not exist, it will not be necessary to reach the foreseeability and public policy factors.

■ While an issue of first impression in Indiana, the courts of other jurisdictions have been faced with the question of whether an attorney for a partnership represents the partnership alone or each of the partners as well. Our review of these cases suggests that the issue has arisen in two distinct types of lawsuits. The first type is an action by disaffected partners, often limited partners who have lost the value of their investment, against the promoters of the partnership. In the course of discovery, plaintiff partners seek partnership information from partner-

1. We have consistently used the balancing test prescribed by *Webb v. Jarvis* to evaluate the existence of duty. See *Heck v. Robey,* 659 N.E.2d 498, 502 n. 3 (Ind.1995)(paramedic's duty to accident victim); *Hooks SuperX v. McLaughlin,* 642 N.E.2d 514, 517 (Ind.1994)(pharmacist's duty to customer); *Mullin v. Municipal City of South Bend,* 639 N.E.2d 278, 283 (Ind. 1994)(city's duty to dispatch ambulance to residential fire); *Walker v. Rinck,* 604 N.E.2d 591, 594 (Ind.1992)(physician's duty to patient); *Stump v. Commercial Union,* 601 N.E.2d 327, 332 (Ind.1992)(employer's workers' compensation insurance carrier's duty to employee).

2. Amicus Hodes argues that while an attorney-client relationship did not exist between defendants and Rice, we should nevertheless find that the defendants had a fiduciary obligation to Rice. In brief, the argument is that where a lawyer's client is a fiduciary, as a partner is vis-a-vis other partners, "there is a third party in the picture (namely the beneficiary) who does not stand at arm's-length from the client; as a consequence, the lawyer also cannot stand at arm's-length from the beneficiary.... Since the lawyer is hired to represent the fiduciary, and the fiduciary is legally required to serve the beneficiary, the lawyer should be deemed employed to further that service." G. Hazard & W. Hodes, *The Law of Lawyering* § 1.3: 108 (Second Ed., 1990).

While we have reached a similar conclusion in a different context, *Walker v. Lawson,* 526 N.E.2d 968 (Ind.1988) (breach of duty by an attorney in drafting a will for a client can form the basis for a claim by known beneficiaries who suffer injury as a consequence of that breach of duty), we decline to apply this theory here. First, as will be seen below, we find that the attorneys here represent the partnership and not individual partners. As such, they were not "hired to represent the fiduciary." Second, plaintiffs argue that the defendants' fiduciary obligation arises directly from an attorney-client relationship between the defendants and Rice, not derivatively as argued by amicus. Particularly since we are reviewing a negative judgment, we find ourselves constrained to testing the judgment on the basis of the arguments advanced by the appellants.

ship's attorneys, and the partnership's attorneys resist, arguing that disclosure of the information is protected by the lawyer-client privilege running between them and the partnership. The plaintiffs respond that, as partners in the partnership, they too are clients of the attorneys and entitled to the information. Most, but not all, of the cases of this type that we have found hold that the information is discoverable.[3] *Wortham & Van Liew v. Superior Court*, 188 Cal.App.3d 927, 932, 233 Cal.Rptr. 725, 728 (1987). *Accord, Roberts v. Heim*, 123 F.R.D. 614, 625 (N.D.Cal.1988); *Contra, Quintel Corp. v. Citibank, N.A.*, 589 F.Supp. 1235 (S.D.N.Y. 1984).

While admittedly the language of these opinions supports plaintiffs' position here, it seems to us that the reason the attorney-client privilege could not be invoked was not because the plaintiffs were clients of the attorneys but because, as a matter of partnership law, the plaintiffs, as partners, were entitled to request and receive partnership information of the character sought to be discovered. *See, e.g.*, Unif. Partnership Act (UPA) § 19 (subject to agreement among the partners, "every partner shall at all times have access to and may inspect and copy any of" the partnership books) and § 20 ("Partners shall render on demand true and full information of all things affecting the part-

nership to any partner"), 6 U.L.A. 598, 602 (1995).[4] As attorneys for the partnership, the attorneys were required to comply with the partnership's disclosure obligations. And in any event, these cases did not present a question of civil liability on the part of the attorneys.[5]

The second type of cases are more like the pattern of the case before us, that is, where a disaffected partner directly sues the partnership's attorney for damages. The leading case of this type appears to be *Security Bank v. Klicker*, 142 Wis.2d 289, 418 N.W.2d 27 (Wis.Ct.App.1987). In that case, the plaintiff partner sought partial summary judgment on the issue of whether an attorney representing a general partnership must also be considered the attorney for each of the individual general partners. The trial court found that a question of fact existed as to this issue and the case proceeded to trial. After a jury verdict found the attorneys not liable to plaintiff, plaintiff sought appellate review of the denial of summary judgment.

In affirming the trial court's denial of summary judgment, *i.e.*, its holding that the attorneys did not have an attorney-client relationship with the plaintiff general partner as a matter of law, the Wisconsin court first explored whether a general partnership is a separate legal entity with rights and liabilities distinct from its partners or an aggrega-

3. The issue is usually analyzed substantially as follows:

> In the context of the representation of a partnership, the attorney for the partnership represents all the partners as to matters of partnership business. Further, partners owe to one another, and general partners owe to limited partners, obligations of good faith, fair dealing. All partners are entitled to access to a wide range of partnership information, whether or not that information is generated under the aegis of the partnership's attorney. *Wortham & Van Liew v. Superior Court*, 188 Cal.App.3d 927, 932, 233 Cal.Rptr. 725, 728 (1987).

4. These provisions of partnership law are not directly implicated by this case since there is no contention that Rice was ever refused access to any partnership books or information he requested.

5. In contrast, *Pucci v. Santi*, 711 F.Supp. 916 (N.D.Ill.1989), was a case in which liability on

the part of a partnership's attorneys was asserted. In *Pucci*, a securities fraud case, plaintiff limited partners asserted that the partnership's attorney breached a fiduciary duty to all of the partners by misrepresenting and failing to disclose critical facts about the partnership. The trial court rejected the attorneys' motion to dismiss, citing *Wortham & Van Liew* and *Roberts v. Heim* as authority for the proposition that an attorney-client relationship existed between the attorneys and the limited partners. 711 F.Supp. at 927. While we have reservations about the court's use of the discovery dispute cases to analyze the defendants' duty in this context, we do find the situations analogous. That is, in *Pucci* the reason the breach of duty claim could not be dismissed was not because the plaintiffs were clients of the attorneys but because, as a matter of securities law, the plaintiffs, as partners, were entitled to receive partnership information of the character allegedly not provided or misrepresented. And, as attorneys for the partnership, the attorneys were required to comply with the partnership's disclosure obligations under the securities laws.

tion of the general partners' rights and liabilities. 142 Wis.2d at 297, 418 N.W.2d at 31. In so doing, we think the Wisconsin court properly identified the threshold issue to be analyzed in deciding whether an attorney-client relationship existed between Strunk and his firm and Rice.

One of the great debates in American business law has been over the question of whether a general partnership is a separate legal entity or an aggregate of the individuals who form it:

> The issue is whether the partnership is in itself a legal person, owning the property and incurring obligations to the partners individually and to third persons, or whether the partners are the only legal persons owning the so-called partnership property and owing the so-called partnership obligations. The former view is called the mercantile or entity theory; the latter, the common law or aggregate theory.

Judson A. Crane, *The Uniform Partnership Act—A Criticism,* 28 Harv.L.Rev. 762, 763 (1915). However,

> the issue ... is not whether a partnership is or is not an entity. It is an entity, because the activities of the partners as partners are separate from their other activities. The issue is whether the group of activities carried on by the partners should be regarded as being carried on by them— which is the actual fact—or as being carried on by a legal personality distinct from the legal personalities of the partners. Thus under the aggregate theory the partners own in common the partnership property, and they are all joint principals in partnership transactions. Under the legal-person theory the partnership legal person owns the partnership property, and the partners are merely its agents.

William Draper Lewis, *The Uniform Partnership Act—A Reply to Mr. Crane's Criticism,* 29 Harv. L.Rev. 158, 162 (1916).

This debate played itself out during the drafting of the UPA during the first two decades of this century and is chronicled in a most interesting series of law journal articles. *See* Crane, *supra;* Lewis, *supra;* William Draper Lewis, *The Uniform Partnership Act—A Reply to Mr. Crane's Criticism,* 29 Harv. L.Rev. 291 (1916); Judson A. Crane, *The Uniform Partnership Act and Legal Persons,* 29 Harv. L.Rev. 838 (1916). And because the Oak Lawn Courts partnership was formed under the UPA and is subject to its provisions,[6] we believe the outcome of this debate is highly relevant to the resolution of the dispute between Rice and Strunk.

In our view, the UPA represents a blend of aggregate and entity principles rather than exclusively one or the other. *See* Alan R. Bromberg and Larry E. Ribstein, 1 *Partnership* § 1.03(b) (1996). Examples of aggregate theory principles are contained in § 15 (joint and several liability of partners), § 29 (technical dissolution of the partnership on the dissolution of any member), and § 25 (nominal ownership of partnership property by the partners rather than the partnership). *Id.* But there are other sections of the UPA that embody entity principles, *e.g.,* §§ 8(3) and 10(1) (partnership can hold title to property); § 9 (partners characterized as agents of the partnership); § 25 (partners do not have individual rights to partnership property); and §§ 30, 38(2), 41 and 42 (partnership business can continue after dissolution). *Id.* And the UPA's definition of "partnership" is neutral on the aggregate-entity issue—the business of the partnership is carried on not by a "legal person" but "by an association of two or more persons ... as co-owners." *Id.* quoting UPA § 6(1).

Because the partnership operates as an aggregate of the partners in some respects and as an entity in others, we must determine which set of principles applies with respect to the relationship between the Oak Lawn Courts partnership and Strunk and his

---

**6.** The Oak Lawn Courts Partnership Agreement provides that the partnership was formed under, and that the agreement is governed by, California law. However, the parties make no specific assertion that the issues in this case are controlled by California law. Because of the similarities between the California UPA, Cal.Corp.Code § 15001 *et seq.,* and the Indiana UPA, Ind.Code § 23–4–1–1 *et seq.,* we believe the partnership law issues would be resolved the same way in either jurisdiction. As to the other issues, we adopt the parties' apparent assumption that Indiana law applies.

firm. That is, if aggregation principles govern the relationship, it is probably fair to consider Strunk and his firm as attorneys for each of the three because the rights and duties of each of the three to manage and conduct the business of the partnership would be identical in all respects.[7] But if entity principles control the relationship, then it would be much more difficult to conclude that Strunk and his firm represent the partners individually. This is because, with the management rights and duties of the partners differing, the partnership would take on the character of an organization wholly distinct from the individual partners.

Section 18(e) of the UPA sets forth the management rights of partners and it employs aggregation principles: "All partners have equal rights in the management and conduct of partnership business." And while § 18(h) provides that "[a]ny difference arising as to ordinary matters connected with the partnership business may be decided by a majority of the partners," the phrasing of this provision indicates that all partners must be consulted before the majority may act. Because the UPA provides that the business of a general partnership is to be managed and conducted by an aggregation of the general partners, we conclude that the attorneys for such a partnership have a separate attorney-client relationship with each of the partnership and each general partner.[8]

■ However, the UPA makes these management rights "subject to any agreement between" the partners. UPA § 18. As such, the partners are authorized to structure by contract the management of the partnership as they see fit, e.g., utilizing entity principles in the place of aggregation principles. A written partnership agreement, then, supersedes the provisions of the UPA and constitutes a binding contract among the parties, enforceable in accordance with its terms. To the extent that a partnership agreement places responsibility for the management of the partnership in the hands of less than all the partners, those partners to whom management responsibilities have been given become the "duly authorized constituents" for purposes of Prof.Con.R. 1.13(a). Such circumstances create an attorney-client relationship only between the at-

7. Defendants argue at some length that they were in a "no win scenario" and "a true Catch-22 position" because if they had advised Rice that Cobin planned to terminate the management agreement, it would have upset the schedule for the refinancing and they might have been sued by Belkin and Cobin. Defendants continue: "The best case for Rice, as argued in his brief, is that [defendants] should have withdrawn their representation of the partnership and advised him to seek 'independent counsel.' Assuming withdrawal would have been possible (which it was not due to the time constraints cited above), Rice *still* would not have known of the upcoming termination of his employment. . . ." To the extent this argument is meant to suggest that lawyers who find themselves with clients with conflicting interests are free to choose sides, we call the defendants attention to Prof.Cond.R. 1.7 and 1.13(e). A lawyer may not represent clients with conflicting interests without consent after consultation. "A lawyer who represents a partnership must take care to avoid the creation of an attorney-client relationship with individual partners unless the lawyer is satisfied that it is ethical to do so and intends to create such a relationship. . . . [S]imultaneous representations of partnerships and individual partners, even on basically unrelated matters, may result in the lawyer possessing confidences of one client that may not be revealed to another, a circumstance which could effectively prevent continued representation of the other client. See Rule 1.7(a). In such a case the lawyer may have to withdraw from one or both of the representations." ABA Comm. On Ethics and Professional Responsibility, Formal Op. 361 (1991) [ABA Ethics Op. 91-361].

8. A Formal Ethics Opinion issued by the American Bar Association Committee on Ethics and Professional Responsibility reaches a different conclusion. It begins with the American Bar Association Model Rule of Professional Conduct 1.13(a) (identical to Ind.Professional Conduct Rule 1.13(a)), which provides that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." The opinion then points out that because "an organization will have goals and objectives that may, or may not, be consistent with the goals and objectives of all or some of its members or other constituents," an attorney for the organization "ordinarily cannot be expected to represent [those] differing interests, but must exercise fidelity to the person, or entity, that engaged his or her services." The opinion concludes that there is "no logical reason to distinguish partnerships from corporations or other legal entities in determining the client a lawyer represents." ABA Ethics Op. 91-361.

torneys and the partnership and not between the attorneys and any individual partner.[9]

▮ In the case before us, all the general partners, including Rice, agreed in writing that Cobin would be the general partner.[10] As such, Cobin was the sole "duly authorized constituent" of the partnership for purposes of engaging attorneys' services. Because of the way the partnership chose to structure its management, the attorneys for this partnership had no attorney-client relationship with the individual partners as matter of partnership law.

▮ However, the fact that the law does not create an attorney-client relationship between Strunk and his firm and Rice by virtue of the attorneys representation of the partnership does not mean that such an attorney-client relationship could not arise in some other way. As ABA Ethics Op. 91–361 points out, such a relationship can arise when a lawyer affirmatively assumes a duty of representation to the individual partner, when a lawyer separately represents the individual partner when the partnership is created or in connection with its affairs, when a lawyer represents an individual partner before undertaking to represent the partnership, and when there is evidence of reliance by the individual partner on the lawyer as the partner's separate counsel or of the partner's expectation of personal representation. *Id. See also Hacker v. Holland,* 570 N.E.2d 951, 955 (Ind.Ct.App.1991), *trans. denied.*

▮ Plaintiffs here argue that even if an attorney-client relationship did not exist as a matter of partnership law, a genuine issue of material fact existed as to whether the attor-

neys represented Rice personally at the closing. As evidence, plaintiffs point to (i) Rice's affidavit that he believed Strunk represented him personally at the closing; (ii) a letter from the closing signed by Strunk referring to himself as "counsel" for the "Beneficiaries of the Oak Law Courts Land Trust," of whom Rice was one; and (iii) a letter from the closing signed by Belkin, Cobin and Rice referring to Thomas M. Gallmeyer of Strunk's firm as "our attorney."

The trial court considered this evidence and found that it did not create a genuine issue of material fact. First, the trial court found that Rice's assertions that he was represented by Strunk at the closing were "conclusory in nature or opinions of Rice and ...," as such, insufficient to raise a factual issue." Second, the trial court examined the closing documents referred to in the preceding paragraph and found that Strunk was acting in a limited agency capacity when he signed them such that no attorney/client relationship existed or was established.[11] The trial court concluded, "Defendants had formed no attorney/client relationship with Don Rice personally or with Jacqueline Rice since 1985, nor did they do so by virtue of representing the partnership to the Oak Lawn Courts refinancing." We have independently reviewed this evidence and agree with the trial court's characterization of it.[12]

In summary, we conclude that an attorney for a general partnership subject to the provisions of the UPA as a matter of partnership law has an attorney-client relationship with each of both the partnership and each individual partner. However, to the extent

---

9. As such, we find the conclusion reached in ABA Ethics Op. 91–361 fully applicable in these circumstances.

10. Paragraph 19 of the Partnership Agreement provides in relevant part:

> [T]he majority in interest of the partners may elect a managing partner who may operate the partnership on a day-to-day basis including making deposits and withdrawals from the partnership bank account.... STEVEN M. COBIN is designated the managing partner.

11. The letter signed by Rice and the others authorized Strunk to sign the disbursement instruc-

tions for the proceeds of the refinancing. The letter signed by Strunk was in fact the disbursement instructions.

12. Defendants have vigorously argued, and we have concluded, that they did not represent Rice at the closing. While there is some argument that Rice was represented by other counsel in connection with the closing, it appears likely that Rice was not represented at the closing. As amicus Hodes reminds us, lawyers have certain professional responsibilities in dealing with unrepresented persons under Prof.Con.R. 4.3. Plaintiffs make no argument along these lines, however, undoubtedly because it is their contention that Rice was represented by the defendants.

that the partners agree that the partnership will be managed in a form other than by all the partners acting in aggregate, the attorney-client relationship will run to the partnership as an entity acting through its duly authorized management. We find such an agreement here and hold that as a matter of partnership law Strunk and his firm had an attorney-client relationship only with the Oak Lawn Courts partnership, acting through its managing partner, Cobin, and not with the individual general partners.

We further conclude that specific circumstances can give rise to an attorney-client relationship between a partnership's attorney and an individual partner even where partnership law does not create it. While plaintiffs assert that such circumstances existed here, to wit, that Strunk represented Rice individually at the closing, we agree with the trial court that there was no genuine issue of material fact on that issue. We therefore hold that Strunk and his firm had no attorney-client relationship with the plaintiffs.

### III

▮ Plaintiffs contend that defendants are guilty of actual fraud. The elements of actual fraud are: (i) material misrepresentation of past or existing facts by the party to be charged (ii) which was false (iii) which was made with knowledge or reckless ignorance of the falseness (iv) was relied upon by the complaining party and (v) proximately caused the complaining party injury. *Pugh's IGA, Inc.*, 531 N.E.2d at 1197. Plaintiffs argue that before the closing the defendants intentionally deceived Rice about Cobin's decision to replace Rice as manager of the apartments and specifically concealed this information from Rice in order that he would proceed with the closing and commit himself on the personal guaranty and management agreement subordination.

▮ The trial court entered the following findings with respect to plaintiff's fraud claim:

32. Defendants did not misrepresent the status of plaintiffs' management con-

tracts at the time of the Oak Lawn Courts refinancing.

33. Rice had no right to rely upon the silence of defendants with respect to the possible termination of the management contracts, for the reason that defendants owed no duty to Rice to break their silence.

34. Any reliance Rice placed on the silence of defendants with respect to the possible termination of the management contracts was not reasonable because it was purely speculative at the time of the closing that Rice would, in fact, be terminated.

35. An attorney has the duty to maintain inviolate the confidence, and, at every peril to himself, to preserve the secrets of his client. 3. I.L.E., Attorney and Client, § 71, p. 443; I.C. 34–1–60–4.

36. Defendants had no discretion to exercise, but were bound to follow the instructions of their client and could not disclose to Rice the impending termination of the management contracts.

37. Defendants had no choice, legal or ethical, but to follow the explicit instructions of their client, Oak Lawn Courts partnership, not to disclose to Rice the fact that the partnership intended to terminate Rice's management contracts.

The Court of Appeals majority opinion did not address the actual fraud claim at all but Judge Sullivan, in his concurring opinion, concluded that "summary judgment was warranted because until the other partners had actually terminated Rice's employment, Strunk did not have knowledge of an existing or past fact. He merely had knowledge that the partners intended to engage in an act in the future. In this sense, the failure of Strunk to make full disclosure of that intention was perhaps, as a matter of law, not the stuff of which a fraud recovery is made." [citations omitted]. *Rice*, 632 N.E.2d at 1156 (Sullivan, J., concurring).

We agree with Judge Sullivan and adopt his analysis. Summary judgment on this issue was also appropriate.

*Conclusion*

Having previously granted transfer, we now affirm the judgment of the trial court.

SHEPARD, C.J., and DeBRULER, DICKSON and SELBY, JJ., concur.