**James L. PERRY and Carolyn S. Perry, Appellants–Plaintiffs,**

v.

**GULF STREAM COACH, INC. and Mark's RV Sales, Inc., Appellees–Defendants.**

**No. 49A02–0403–CV–225.**

Court of Appeals of Indiana.

Aug. 31, 2004.

Rehearing Denied Oct. 26, 2004.

Robert S. Rifkin, Clinton E. Blanck, Maurer Rifkin & Hill, P.C., Carmel, IN, Attorneys for Appellants.

Brian L. Hoffer, Randy J. Spitaels, Kindig & Sloat, PC, Nappanee, IN, Attorneys for Appellee Gulf Stream Coach, Inc.

Christopher R. Whitten, Craig J. Helmreich, Scopelitis Garvin Light & Hanson, Indianapolis, IN, Attorneys for Appellee Mark's RV Sales, Inc.

## OPINION

BAILEY, Judge.

### Case Summary

Appellants–Plaintiffs James L. Perry and Carolyn S. Perry (the "Perrys") appeal the trial court's grant of summary judgment to Appellees–Defendants Gulf Stream Coach, Incorporated ("Gulf Stream") and Mark's RV Sales, Incorporated ("Mark's RV"). We affirm in part and reverse in part.

### Issue

The Perrys raise one issue, which we expand and restate as:

I. Whether the trial court erroneously granted summary judgment to Gulf Stream because genuine issues of material fact exist regarding whether the limited warranty offered by Gulf Stream fails of its essential purpose; and

II. Whether the trial court erroneously granted summary judgment to Mark's RV because genuine issues of material fact exist concerning whether Mark's RV breached express and implied warranties and violated Indiana's Deceptive Consumer Sales Act.

### Facts and Procedural History

#### I. Background

The relevant designated facts are undisputed. In 1999, the Perrys decided to purchase "a Class A motor home with a length of 25 or 26 feet." Appellants' App. at 27, ¶ 13. Because Gulf Stream is in the business of manufacturing and selling motor homes, the Perrys contacted Gulf Stream and inquired into purchasing a Class A motor home. Gulf Stream gave the Perrys the contact information for Mark's RV, an authorized dealer for Gulf Stream. On December 8, 1999, the Perrys arrived at Mark's RV and read a brochure ("Brochure") regarding the "Conquest 2000 by Gulf Stream." The Brochure indicated that the Conquest 2000 had power steering and brakes and a Front Gross Axle Weight Rating ("Front GAWR") of 4,800 pounds.[1] In addition, the Brochure highlighted numerous features of the Conquest 2000, including "Generous Overhead Storage," "Large Under Bed Storage," and "Steel–Formed Exterior Storage." Gulf Stream's App. at 230. The Brochure directed those who wish to purchase the Conquest 2000 to "√ MARK'S [RV] BEFORE YOU BUY." *Id.* (emphasis in original). The Brochure also provided potential customers with Mark's RV's business

---

**1.** The Motor Home had a manufacturer's label, which represented that the Front GAWR was 4300. However, this label was determined to be incorrect.

address, phone number, and Internet address.

## II. Purchase Agreement and Limited Warranty

At Mark's RV, the Perrys walked through the Conquest 2000 ("Motor Home") for five to ten minutes "to see if it matched the [B]rochure." Appellants' App. at 27, ¶ 18. The Perrys did not test drive the Motor Home. That same day, the Perrys agreed to purchase the Motor Home for a price of $54,521.50. The Purchase Agreement between Mark's RV and the Perrys provides, in part, that:

Purchasers certify that the matter printed on the back hereof has been read and agreed to as a part of this agreement the same as though it were printed above the signatures....

Mark's RV App. at 162. On the back of the Purchase Agreement, the following clause appears:

7. Warranties: The dealer shall give over to the buyer copies of any and all written warranties covering the within described unit, or any appliance or component therein, which have been provided by the manufacturer of the unit or compliance or component, respectively. *IT IS UNDERSTOOD AND AGREED THAT EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE STATE LAW THE DEALER MAKES NO WARRANTIES WHATSOEVER REGARDING THE UNIT OR ANY APPLIANCE OR COMPONENT CONTAINED THEREIN. THE DEALER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANITES [WARRANTIES], INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE.*

The purchaser further represents he has examined the product and found it suitable for his particular needs, that it is of acceptable quality, and that he did rely on his own judgment and inspection and not on any warranty, express or implied.

*Id.* at 163 (emphasis in original). On the bottom of the back page, the following integration clause appears:

This agreement contains the entire understanding between buyer and seller and no other representation or inducement, verbal or written, has been made which is not set forth herein.

*Id.*

Along with the Purchase Agreement, Mr. Perry also signed the "Gulf Stream Coach, Inc. Limited Warranty" ("Limited Warranty"), which provides, in relevant part, that:

1. *WHAT IS COVERED*

Your new recreational vehicle has a limited warranty by [Gulf Stream] to the original purchaser as follows:

a) A two (2) year or 24,000 miles of use warranty (whichever comes first) against structural defects in floors, walls and roof.

b) A full one (1) year or 12,000 miles of use warranty (whichever comes first) under normal use against defects in materials and/or workmanship in the construction of the vehicle and its original components.

... All obligations of Gulf Stream pursuant to this Limited Warranty are limited to replacing or repairing the defective part or component.

This limited warranty is expressly IN LIEU of any other express warranty and is further IN LIEU of any implied warranty, including, but not limited to, any implied WARRANTY OF MERCHANTABILITY or FITNESS for a particular purpose except

as may otherwise be required by applicable valid Federal or State law at time of manufacture.

*Id.* at 166 (emphasis in original).

### III. Weight–Bearing Capacity of the Motor Home

The Motor Home has the following manufacturer's rated capacities: (1) a fifty gallon fresh water tank at 8.328 pounds per gallon for a total weight of 416.4 pounds; (2) a fifty gallon water gray holding tank for a total weight of 416.4 pounds; (2) a fifty gallon water black holding tank for a total weight of 416.4 pounds; (3) an LP gas tank with a capacity of sixty-five pounds; (4) a forty gallon fuel tank at six pounds per gallon for a total weight of 240 pounds; (5) four passengers at one hundred and fifty pounds per person when the passengers are seated, belted, and traveling for a total weight of 600 pounds.

Despite these weighted capacities, the Certificate of Origin of the chassis of the Motor Home, which was built by Workhorse Custom Chassis, LLC, ("Workhorse") demonstrates that the shipping weight of the chassis was 4,221 pounds and that the Gross Vehicle Weight Rating ("GVWR") is 12,300 pounds. The Certificate of Origin of the Motor Home, i.e., chassis and motor home body, indicates that the shipping weight of the vehicle was 11,073 pounds and that the GVWR is 12,300 pounds. The latter shipping weight, however, did not include the weight of any fluids. The difference between the GVWR—i.e., the maximum weight capacity of the Motor Home—and the shipping weight of the Motor Home after it was fully assembled by Gulf Stream is 1,227 pounds.

### IV. Owner's Manual of the Motor Home

The owner's manual to the Motor Home provides, in relevant part, as follows:

*VEHICLE LOADING*

*Carrying Capacity*

During the design and development of our motor homes, the number and size of storage compartments are maximized for value and convenience. If the motor home operator fills all liquid tanks to capacity, fills all storage compartments and cupboards to maximum volume and fills all available seating positions with passengers, the motor home will probably be overloaded. According to National Highway Traffic Safety Administration figures, an average vehicle occupant weighs 150 pounds, each gallon of gasoline weighs six pounds and each gallon of water weighs over eight pounds. The operator is responsible for analyzing the conditions in which the motor home will be utilized for each trip.

The number of passengers and placement of cargo will affect the amount of water and cargo that you can carry. The passenger capacity will vary depending on whether the vehicle is being used for overnight camping or day use. A smaller passenger capacity for camping will provide reasonable cargo capacity for trips taking more than one day. The passenger capacity for day use can be larger providing that less cargo is carried for trips and activities not involving overnight stays. It may be necessary to reduce the amount of water carried and unload some cargo items normally carried for camping in order to provide carrying capacity for the additional 1(one) day use passengers.

Thoughtful consideration of the weight placed in the motor home can yield important benefits:

● maximum flexibility in the use of the liberal storage facilities provided in the motor home;

- improved handling characteristics and ride comfort;
- better fuel mileage and reduced tire wear.

Periodically reweigh your motor home. Different traveling configurations may change your loading and weight pattern.

WARNING: DO NOT EXCEED THE RATED LOAD OF THE MOTOR HOME, OR THE RATED LOAD OF ANY AXLE.

NOTE: THE CARRYING CAPACITY OF YOUR MOTOR HOME CAN BE DETERMINED BY WEIGHING, AS SHOWN IN FIG. 2. THE SHIPPING WEIGHT DOES NOT INCLUDE OPTIONS SUCH AS LEVELING JACKS, AWNINGS, ROOF PODS, ETC. THE WEIGHT OF THESE ITEMS MUST BE SUBTRACTED FROM THE TOTAL OF THE PASSENGER AND CARGO CARRYING CAPACITIES. IF YOU TOW A TRAILER . . .

Notice: Empty all holding tanks before filling fresh water tank otherwise you will limit cargo and/or passenger capacity.

\* \* \* \* \*

WARNING: EXCEEDING THE GAWR OR GVWR[2] OF YOUR MOTOR HOME CAN CAUSE UNDESIRABLE HANDLING CHARACTERISTICS AND MAY CREATE A SAFETY HAZARD.

*Id.* at 175–76.

### V. The Perrys' Use of the Motor Home

After purchasing the Motor Home and driving it for approximately 2,000 miles, Mr. Perry noticed problems with steering. In January of 2000, the Perrys took their first trip in the Motor Home and experienced "problems with stopping, braking and handling the vehicle." Appellants' App. at 30. In particular, the Motor Home would drift and crawl from one side of a highway lane to another; the brake pedal required a lot of pressure to stop, as if the vehicle did not have power brakes;[3] the front tire was showing unusual wear, as if the front-end were out of alignment; and it was very difficult to turn the wheel when the vehicle was stopped.

During this trip, the Perrys traveled with a full tank of fresh water and propane, but they emptied the gray and black tanks, which were used as wastewater holding tanks. The Perrys also traveled with enough clothing for the two-week trip, no camping equipment, and enough food and drink supplies to last for "at least a week or at least three or four days." *Id.* at 255. In addition, the Motor Home contained three passengers, weighing a combined total of approximately 550 pounds, and a full tank of gasoline.

When the Perrys returned home after this first trip, they contacted Workhorse, Gulf Stream, and Mark's RV and informed the companies that the Motor Home was out of alignment. Workhorse authorized the Perrys to have the front-end of the Motor Home aligned. In addition, after driving the Motor Home only 6,000 or 7,000 miles, Mr. Perry replaced a front tire on the Motor Home.

Subsequently, in February of 2000, Mr. Perry, along with at least two other people, traveled to Florida and experienced the same steering and braking problems. The Perrys reported the problems to

---

2. As will be discussed later, "GVWR" is the abbreviation for Gross Vehicle Weight Rating.

3. Upon receiving the Motor Home, Mark's RV indicated that the vehicle's "[b]rakes seem soft." Appellants' App. at 289.

Workhorse and Gulf Stream and, in response, Workhorse arranged for the Motor Home to be inspected at Boulder–Chevrolet–Buick ("Boulder"). Boulder had the Motor Home from March 8 to March 24, 2000, during which time, it "replaced the power steering pump, steering gear and hydroboost pressure, belt, suspension and steering parts, and [adjusted the] alignment." Appellants' App. at 272.

In his deposition, J.R. Jenson ("Jenson"), who was the Service Manager of Boulder, testified that "[he] test-drove the vehicle [himself.] The steering problem reported by Mr. Perry still existed after all of the repair attempts [Boulder] made." Appellants' App. at 272. Jenson further testified that:

14. [a]fter we followed all of the instructions given to us by Workhorse and by Chevrolet, the steering problem with the motor home persisted.

15. Representatives from Workhouse stated that the problem may be due to excess weight on the front axle from the motor home body and suggested that the vehicle be weighed....

Appellants' App. at 272.

## VI. The Weight of the Motor Home

At the request of Workhorse, the Perrys had the Motor Home weighed on four separate occasions. On March 24, 2000, with Mr. Perry, i.e., weighing 180 pounds, in the driver's seat, less than one-half tank of gasoline, no water, some propane fuel, and some camping gear, the weight over the front axle was 4,940 pounds and the gross vehicle weight was 11,680 pounds. On March 28, 2000, with Mr. Perry in the driver's seat, less than one-half tank of gasoline, no water, some propane fuel, and

no camping gear, the weight over the front axle was 4,800 pounds and the gross vehicle weight was 11,140 pounds. On May 11, 2000, with no driver or passengers, less than one-half tank of gasoline, no water, some propane fuel, and no gear, the weight over the front axle was 4,620 pounds and the gross vehicle weight was 10,940 pounds. Lastly, on August 22, 2001, with no passengers, a full tank of gasoline, no water, some propane fuel, and no gear, the weight over the front axle was 4,640 pounds and the gross vehicle weight was 11,030 pounds.

On May 15, 2000, Workhorse Representative Winston M. Moore ("Moore") examined the Motor Home and determined that its brakes and steering were normal. Anthony Suddon ("Suddon"), Director of Consumer Affairs with Gulf Stream, also inspected the Motor Home and determined that "[t]he vehicle drove with no problems at all times during the inspection. The weights show that the vehicle has sufficient cargo capacity if loaded properly. It is my belief that the Perry's [sic] feel the steering and brake condition is caused by the vehicle being overweight. The vehicle is not overweight and the steering and braking work as designed." Gulf Stream App. at 21. Because he believed that no repairs were necessary, Suddon did not recommend any repairs for the Motor Home. Rather, he noted that "[i]f the Perry's [sic] wish to have more carrying capacity for the front rear axle I would suggest upgrading the tires." Id. With the tires installed by the chassis manufacture, "[t]he maximum weight allowed on the front axle is 4,880 lbs." Id. at 21.

## VII. Commencement of the Present Litigation

On December 1, 2001, the Perrys filed an amended complaint against Gulf

Stream, Mark's RV, and Workhorse,[4] alleging breach of express and implied warranties and violations of Indiana's Deceptive Consumer Sales Act. On May 30, 2003, and on June 4, 2003, respectively, Gulf Stream and Mark's RV filed separate motions for summary judgment. On November 24, 2003, the trial court granted Gulf Stream's and Mark's RV's motions for summary judgment. In so doing, the trial court entered findings of fact and conclusions thereon. On December 17, 2003, the Perrys filed a motion to correct error, which the trial court denied. This appeal by the Perrys ensued.

## Discussion and Decision

### I. Standard of Review

On review of a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court: we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to judgment as a matter of law. *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 855 (Ind.1999). Once the moving party has sustained its initial burden of proving the absence of a genuine issue of material fact and the appropriateness of judgment as a matter of law, the party opposing summary judgment must respond by designating specific facts establishing a genuine issue for trial. *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind.1992). We may consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties for purposes of the motion for summary judgment. Ind. Trial Rule 56(C), (H). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in

favor of the nonmoving party. *Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 633 (Ind.1991). Although the nonmovant has the burden of demonstrating that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the nonmovant was not improperly denied his or her day in court. *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind.1997).

In addition, where a trial court enters findings of fact and conclusions thereon in granting the motion for summary judgment, as the trial court did in this case, the entry of specific findings and conclusions does not alter the nature of our review. *Rice v. Strunk*, 670 N.E.2d 1280, 1283 (Ind.1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. *Id.* They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.*

### II. Analysis

#### A. Summary Judgment to Gulf Stream: Limited Warranty Fails of Essential Purpose

On appeal, the Perrys first argue that the trial court erroneously granted summary judgment to Gulf Stream because genuine issues of material fact exist regarding whether the Limited Warranty fails of its essential purpose pursuant to Indiana Code Section 26–1–2–719(2). Specifically, the Perrys contend that because numerous repair attempts failed to resolve the Motor Home's braking and steering problems, Gulf Stream's limited remedy of repair or replacement of parts failed of its essential purpose and, thus, the Perrys should be able to claim all buyer's remedies provided by the Uniform Commercial Code.

4. On September 11, 2003, the Perrys moved to voluntarily dismiss their complaint against Workhorse, which the trial court granted with prejudice. Accordingly, Workhorse is not a party to this appeal.

Indiana Code Section 26–1–2–719 permits buyers and sellers to agree on a limitation of remedy. In particular, Indiana Code Section 26–1–2–719(1)(a) allows contracting parties to modify or limit the damages recoverable in a contract dispute, i.e., by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts, or to expressly agree to an exclusive or sole remedy. However "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in IC 26–1." See Ind. Code § 26–1–2–719(2).

■ Limitations of remedy are not favored in Indiana and are strictly construed against the seller on the basis of public policy. See Martin Rispens & Son v. Hall Farms, Inc., 621 N.E.2d 1078, 1085 (Ind. 1993), reh'g denied. In Martin Rispens & Son, our supreme court observed that:

> Commentators have suggested that § 2–719, as it relates to failure of essential purpose, is not concerned with arrangements which were oppressive at the inception which is a question of unconscionability, but with the application of an agreement to "novel circumstances not contemplated by the parties." In addition, they have suggested that this provision should be triggered when the remedy fails of its essential purpose, not the essential purpose of the UCC, contract law, or of equity. One author suggests that the method used to decide whether a particular limitation fails of its essential purpose is to identify the purpose underlying the provision and determine whether application of the remedy in the particular circumstances will further that purpose. If not, then, and only then, is there a failure of essen-

tial purpose. *Thus, for example, where the sale of a car was accompanied by the exclusive remedy of repair and replacement of defective parts but attempted repairs were ineffective in correcting the problems, the purchaser was entitled to recover an amount in excess of the cost of repairs.*[5] *The exclusive remedy of repair and replacement of defective parts failed of its essential purpose because the car could not be repaired so as to operate free of defects as promised in the express warranty.* Id. at 1085–86 (emphasis added and citations omitted).

In the present case, the Limited Warranty issued by Gulf Stream warrants against defects in the materials and/or workmanship in the construction of the vehicle and its original components. However, the Limited Warranty expressly provides that "[a]ll obligations of Gulf Stream pursuant to this Limited Warranty are limited to replacing or repairing the defective part or component." Mark's RV App. at 166. In addition, the designated evidence reveals that after driving the Motor Home, which was new at the time of purchase, approximately two thousand miles, Mr. Perry experienced problems with steering. In addition, after only five or six thousand miles, the Motor Home required a front-end alignment and the replacement of a front tire.

The evidence further demonstrates that from March 8 to March 24, 2000, Boulder replaced the Motor Home's power steering pump, steering gear and hydroboost pressure, belt, suspension and steering parts and alignment. Yet, even with these repairs, Jenson, i.e., the Service Manager at Boulder, test-drove the Motor Home and noticed that "[t]he steering problem reported by Mr. Perry still existed after all of the repair attempts [Boulder] made." Appellants' App. at 272. Indeed, in his

---

5. See, e.g., Riley v. Ford Motor Co., 442 F.2d 670 (5th Cir.1971).

deposition, Jenson testified that "[a]fter we followed all the instructions given to us by Workhorse and Chevrolet, the steering problem with the [M]otor [H]ome persisted." *Id.* ¶ 14.

However, the evidence also reveals that Suddon, i.e., Gulf Stream's Director of Consumer Affairs, inspected the Motor Home and concluded that "the steering and braking work as designed." Gulf Stream App. at 21. In addition, Moore, i.e., Workhorse's representative, examined the Motor Home and determined that the brakes and steering were normal.

■ This disputed evidence regarding a defect in the "materials and/or workmanship in the construction of the vehicle and its original components" demonstrates that, similar to the car illustration in *Martin Rispens & Son*, here, there is at least a genuine issue of material fact as to whether Gulf Stream's exclusive remedy of repair and replacement of defective parts or components fails of its essential purpose such that the Perrys may seek other remedies provided by Indiana Code 26-1. *See* Ind.Code § 26-1-2-719(2). Accordingly, the trial court erred by granting summary judgment to Gulf Stream on this issue.[6]

## B. Summary Judgment to Mark's RV

■ The Perrys next challenge the trial court's grant of summary judgment to

Mark's RV on the basis that genuine issues of material fact exist concerning whether Mark's RV breached express and implied warranties and, further, whether the company violated Indiana's Deceptive Consumer Sales Act. In response, Mark's RV argues that the Perrys have waived these issues by failing to assert a cogent argument in their appellants' brief. The law is well settled that grounds for error may only be framed in the appellant's initial brief and if addressed for the first time in the reply brief, they are waived. *See French v. State,* 778 N.E.2d 816, 826 (Ind. 2002) (holding that the appellant waived an issue by not raising it in his principal brief); *see also* Ind. Appellate Rule 46(C). However, despite waiver, we may review the issue if the noncompliance with the Appellate Rules does not impede our review. *See, e.g., Mid State Bank v. 84 Lumber Co.,* 629 N.E.2d 909, 911 n. 1 (Ind.Ct.App.1994) (recognizing that an appellate court may review a waived issue if the party's noncompliance with the Appellate Rules does not impede our review). In this case we review the waived issues.[7]

### 1. Breach of Warranties

#### a. Express

■ The Perrys argue that the trial court erroneously granted summary judg-

---

6. Additionally, we observe that the Magnuson Moss Act does not apply to the controversy at bar. The Magnuson Moss Act provides a cause of action for consumers against suppliers of goods who breach express or implied warranties and limits the extent to which manufacturers may disclaim or modify implied warranties when they give an express warranty. *Abraham v. Volkswagen of Am., Inc.,* 795 F.2d 238, 247 (2nd Cir.1986). However, that part of Magnuson–Moss forbidding manufacturers from disclaiming implied warranties if they give an express warranty only extends to implied warranties under which they would have been liable to the consumer according to state law. *Id.* at 247–49. If a

manufacturer would not be liable to the consumer under an implied warranty theory because of state law privity requirements, then there is nothing that the manufacturer could improperly disclaim. *Id.* Accordingly, because Magnuson Moss does not dispose of our state's privity requirement and because the Perrys are not in privity with the remote manufacturer, i.e., Gulf Stream, it is inapplicable to the present controversy. *See, e.g., id.* at 249.

7. We hereby deny Mark's RV's motion to strike the Perrys' reply brief.

ment to Mark's RV on their claim that Mark's RV breached an express warranty. In particular, the Perrys contend that Mark's RV expressly warranted the quality of the Motor home by endorsing the representations made in the Brochure and by making the Limited Warranty a part of the Purchase Agreement of the Motor Home. Indiana Code Section 26–1–2–313 defines an express warranty, in part, as "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

Here, however, the Purchase Agreement between Mark's RV and the Perrys unequivocally provides that:

7. Warranties: The dealer shall give over to the buyer copies of any and all written warranties covering the within described unit, or any appliance or component therein, which have been provided by the manufacturer of the unit or compliance or component, respectively. *IT IS UNDERSTOOD AND AGREED THAT EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE STATE LAW THE DEALER MAKES NO WARRANITES [WARRANTIES] WHATSOEVER REGARDING THE UNIT OR ANY APPLIANCE OR COMPONENT CONTAINED THEREIN.*

\* \* \* \* \*

The purchaser further represents he has examined the product and found it suitable for his particular needs, that it is of acceptable quality, and that he did rely on his own judgment and inspection and not on any warranty, express or implied.

Mark's RV App. at 163 (Emphasis in original). The Purchase Agreement also contains an integration clause clarifying that it is "the *entire understanding* between buyer and seller and *no other representation or inducement, verbal or written, has been made which is not set forth herein.*" *Id.* (emphasis added). Thus, the evidence reveals that, as a matter of law, Mark's RV did not expressly warrant the Motor Home. Accordingly, the trial court did not err by granting summary judgment to Mark's RV on the Perrys' breach of express warranty claim.

*b. Implied Warranties of Merchantability and Fitness for Particular Use*

The Perrys also contend that the trial court's grant of summary judgment to Mark's RV was erroneous because Mark's RV's disclaimer of the implied warranties of merchantability and fitness for a particular use was ineffective and because, as such, a genuine issue of material fact exists regarding whether Mark's RV breached the implied warranties of merchantability and fitness for use. Unless excluded or modified, a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Ind.Code § 26–1–2–314. In addition, Indiana Code Section 26–1–2–315 provides that:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified . . ., an implied warranty that the goods shall be fit for such purpose.

However, contracting parties may exclude or modify the implied warranties of merchantability and fitness for a particular purpose. Indiana Code Section 26–1–2–316 provides, in pertinent part, that:

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.

Indiana Code Section 26–1–1–201(10) explains that a "term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." Language in the body of a form is conspicuous if it is capitalized or in larger, or other contrasting, type or color. *See, e.g., id.* Whether a term or clause is conspicuous is a question of law for the court. *Id.; see also Jones v. Abriani,* 169 Ind.App. 556, 571, 350 N.E.2d 635, 645 (1976). Where a purported exclusion of implied warranties was located at the bottom of the reverse page of a contract, which page did not contemplate the signature of the buyer, the court could properly find that the purported disclaimer was not sufficiently conspicuous. *Martin Rispens & Son,* 621 N.E.2d at 1084.

In the present case, the Purchase Agreement provides that: "Purchasers certify that the matter printed on the back hereof has been read and agreed to as a part of this agreement the same as though it were printed above the signatures...." Mark's RV App. at 162. On the back of the Purchase Agreement, the following clause appears:

7. Warranties: ... *THE DEALER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES IN-*

*CLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE.*

*Id.* at 163. Because the Purchase Agreement at issue alerted the Perrys to read the reverse side of the Agreement, coupled with the fact that the implied warranties disclaimer was contained in a paragraph entitled "Warranties," written in all capital letters, and underlined, we hold that the disclaimer was conspicuous.[8] *See* Ind. Code § 26–1–1–201(10). Accordingly, the implied warranties disclaimer was effective.[9] As such, the trial court did not err by granting summary judgment to Mark's RV on the Perrys' claims for breach of the implied warranties of merchantability and fitness for a particular purpose or use.

### 2. Indiana's Deceptive Consumer Sales Act

The Perrys further assert that the trial court erroneously granted summary judgment in favor of Mark's RV on the claim that Mark's RV violated Indiana's Deceptive Consumer Sales Act. The express purpose of the Deceptive Consumer Sales Act ("Act") is to "protect consumers from suppliers who commit deceptive and unconscionable sales acts" and to "encourage the development of fair consumer sales practices." Ind.Code §§ 24–5–0.5–1(b)(2), –1(b)(3). The Act gives consumers and the attorney general the power to sue suppliers who engage in "deceptive acts." Ind. Code § 24–5–0.5–4.

In general terms, the structure of the Act is such that if a good or service, such as the Motor Home in question, turns

---

8. Perhaps, the better practice would be to have purchasers acknowledge and sign the disclaimer clause itself.

9. The Perrys also contend that they did not read the Purchase Agreement before signing it. However, this argument is of no consequence because, under Indiana law, a person is presumed to understand and assent to the terms of the contracts he or she signs. *Buschman v. ADS Corp.,* 782 N.E.2d 423, 428 (Ind.Ct.App.2003).

out to be other than as represented, the consumer may invoke the Act by giving notice of the problem to the supplier. *See McKinney v. State*, 693 N.E.2d 65, 68 (Ind. 1998). "The supplier then has thirty days to offer to fix it. If a cure is accomplished in a reasonable time that is the end of the matter." *See id.* However, if either the defect is intentional, or the supplier fails to supply goods or services conforming to the representations, the consumer has a claim under the Act and may recover attorney fees among other remedies. *Id.*

The Act provides for two types of actionable deceptive acts: "uncured" deceptive acts and "incurable" deceptive acts. *See* Ind.Code § 24–5–0.5–2(6), –2(7). An uncured deceptive act is "a deceptive act ... with respect to which a consumer who has been damaged by such act has given notice to the supplier under section 5(a)," [10] but the supplier either fails to offer to cure within thirty days or does offer to cure but fails to cure within a reasonable time after the consumer accepts the offer. *See* Ind. Code § 24–5–0.5–2(6). An incurable deceptive act is "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." *See* Ind.Code § 24–5–0.5–2(7). Intent to defraud or mislead is thus clearly an element of an incurable deceptive act. *See McKinney*, 693 N.E.2d at 68. However, intent is not essential to an uncured deceptive act. *See id.*

■ Pursuant to Indiana Code Section 24–5–0.5–3(a), a deceptive act occurs when a supplier, i.e., Mark's RV in this case, represents either orally or in writing that the subject matter of a consumer transaction, i.e., the Motor Home, "has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have." *See also* Ind.Code § 24–5–0.5–2(a)(3)(A) ("Supplier means ... a seller, lessor, assignor, or other person who regularly engages in or solicits consumer transactions, including a manufacturer, wholesaler, or retailer, whether or not he deals directly with the consumer"). This section is to be liberally construed to protect the consumer. *See* Ind.Code § 24–5–0.5–1.

In the present case, to prevail on their claim under the Act, the Perrys are required to show that Mark's RV engaged in an uncured deceptive act and that Mark's RV received proper notice pursuant to Indiana Code Section 24–5–0.5–5(a). The parties do not dispute that the Perrys gave Mark's RV proper and timely notice. Rather, the controversy exists regarding whether Mark's RV engaged in an uncured deceptive act.

The designated evidence demonstrates that when the Perrys arrived at Mark's RV, they read the Brochure, which indicated that the Conquest 2000 had power steering and brakes and a Front GAWR of 4,800 pounds. In addition, the Brochure highlighted various features of the Conquest 2000, including "Generous Overhead Storage," "Large Under Bed Storage,"

---

**10.** Section 5(a) provides that
No action may be brought under this chapter ... unless
(1) the deceptive act is incurable or
(2) the consumer bringing the action shall have given notice in writing to the supplier within the sooner of
(i) six (6) months after the initial discovery of the deceptive act, (ii) one (1) year following such consumer transaction, or
(iii) any time limitation, not less than thirty (30) days, of any period of warranty applicable to the transaction, which notice shall state fully the nature of the alleged deceptive act and the actual damage suffered therefrom, and unless such deceptive act shall have become an uncured deceptive act.
Ind.Code § 24–5–0.5–5.

and "Steel–Formed Exterior Storage." Gulf Stream's Appellee's App. at 230. A decal on the Brochure directed anyone who wished to purchase the Conquest 2000 to "√ MARK'S [RV] BEFORE YOU BUY" *Id.* (emphasis in original). The Brochure also gave potential customers Mark's RV's business address, phone number, and Internet address. This evidence creates a genuine issue of material fact as to whether Mark's RV adopted the representations made by Gulf Stream in the Brochure.

Further, the undisputed evidence reveals that, when Mark's RV took possession of the Motor Home, it received a Certificate of Origin representing that the shipping weight of the Motor Home, when fully assembled, was 11,073 pounds and that the GVWR was 12,360 pounds, excluding the weight of any fluids. Thus, the Motor Home arrived at Mark's RV weighing only 1,227 pounds less than the maximum GVWR of 12,300 pounds, not including fluids such as water and gasoline, passengers, and luggage. In addition, prior to selling the Motor Home to the Perrys, Mark's RV had access to the vehicle's owner's manual, which provides that "[i]f the motor home operator fills all liquid tanks to capacity, fills all storage compartments and cupboards to maximum volume and fills all available seating positions with passengers, the motor home *will probably be overloaded.*" Mark's RV App. at 175–76 (emphasis added).

The evidence also demonstrates that when the Perrys began experiencing braking and steering problems with the Motor Home, they had the Motor Home weighed to determine if excess weight on the front axle was contributing to or causing the problems. After weighing the Motor Home on March 24, 2000, the weight on the front axle exceeded the maximum front GAWR when the Motor Home contained only Mr. Perry in the driver's seat, less than one-half tank of gasoline, no water, some propane fuel, and some camping equipment. In addition, on March 28, 2000, the weight on the front axle was 4,800 pounds, which is either the maximum Front GAWR or eighty pounds less than the maximum Front GAWR,[11] when the Motor Home contained only Mr. Perry in the driver's seat, less than one-half tank of gasoline, no water, some propane fuel, and no camping gear. Thus, without use of the generous overhead storage, large under bed storage, and the steel-formed exterior storage—which were arguably a selling point of the Motor Home—the Motor Home either exceeded the Front GAWR or weighed in at maximum Front GAWR. This evidence creates a genuine issue of material fact regarding whether Mark's RV engaged in an uncured deceptive act by adopting the representations made in the Brochure. Moreover, this evidence creates a genuine issue of material fact regarding whether Mark's RV knew or should have known that the representations made in the Brochure were false.[12]

For the foregoing reasons, we affirm the trial court's grant of summary judgment to Mark's RV on the Perrys' breach of express and implied warranty claims. However, we reverse the trial court's grant of summary judgment to Gulf Stream on the

---

11. The evidence is disputed as to whether the Front GAWR of the Motor Home is 4,800 pounds as represented in the Brochure, or 4,880 pounds, as represented by certain inspection reports. However, such dispute is not material for purposes of our present analysis.

12. We limit our discussion of the Act to Mark's RV because, on appeal, the Perrys have not argued that Gulf Stream also violated the Act.

issue of whether the Limited Warranty fails of its essential purpose and the trial court's grant of summary judgment to Mark's RV on the question of whether Mark's RV violated the Act.

Affirmed in part and reversed in part.

BAKER, J., and FRIEDLANDER, J., concur.