**P.R. MALLORY & COMPANY, INC.,** including Radio Materials Corporation, Kraft Foods Global, Inc., a Delaware Corporation, formerly known as Kraft Foods North America, Inc., Kraft Foods, Inc., Kraft General Foods, Inc., and Dart & Kraft, Inc., composed of Kraft, Inc. and Dart Industries, Inc., suing herein on its own behalf and on behalf of Radio Materials Corporation, Appellant–Plaintiffs,

v.

**AMERICAN CASUALTY COMPANY OF READING, PA.,** a Pennsylvania Corporation; Continental Casualty Company, an Illinois Corporation; and Does Insurance Companies 1–10, Appellees–Defendants.

No. 54A01–0903–CV–142.

Court of Appeals of Indiana.

Jan. 29, 2010.

John S. Capper IV, Capper Tulley & Reimondo, Crawfordsville, IN, Michael J. Miguel, Morgan, Lewis & Bockius LLP, Los Angeles, CA, Paul A. Zevnik, Morgan, Lewis & Bockius LLP Washington, D.C., Attorneys for Appellants.

Tammy J. Meyer, MillerMeyer LLP, Indianapolis, IN, Scott E. Turner, Lisa C. Ellison, Troutman Sanders LLP, Chicago, IL, John R. Gerstein, Patrick F. Hofer, Troutman Sanders LLP, Washington, D.C., Attorneys for Appellees.

## OPINION

BROWN, Judge.

P.R. Mallory & Company, Inc., including Radio Materials Corporation, Kraft Foods Global, Inc., and Dart & Kraft Inc. (collectively, the "Plaintiffs") appeal the trial court's grant of summary judgment to American Casualty Company of Reading, PA, ("ACC") and Continental Casualty Company ("CCC"). The Plaintiffs raise four issues, which we consolidate and restate as whether the trial court erred by granting ACC and CCC's motion for summary judgment.[1] We affirm.[2]

---

1. We heard oral argument in this case on October 29, 2009, at Vincennes University. We wish to thank counsel for their advocacy and extend our appreciation to the faculty, staff, and students of Vincennes University for their hospitality.

2. We note that the Plaintiffs' statement of case and ACC and CCC's statement of case both contain argument. We remind the parties that Ind. Appellate Rule 46(A)(5) provides that the statement of case "shall briefly describe the nature of the case, the course of the proceedings relevant to the issues presented for review, and the disposition of these issues by the trial court or Administrative Agency."

We also note that the Plaintiffs' Appendix included numerous exhibits covering hundreds of pages and the table of contents listed them only collectively. We remind Plaintiffs that Ind. Appellate Rule 50(C) provides that "[t]he table of contents shall specifically identify each item contained in the Appendix...."

The relevant facts follow.[3] Radio Materials Corporation, an Illinois corporation, was founded in 1947 in Chicago, Illinois, to manufacture picture tubes and ceramic capacitors for the television industry. In 1948, Radio Materials Corporation opened a plant in Attica, Indiana. In 1957, P.R. Mallory & Company, Inc. purchased the stock of Radio Materials Corporation. 1978, P.R. Mallory & Company, Inc. sold its assets to Radio Materials Corporation, a Nevada corporation. At some point, Kraft Foods Corporation became the successor to the P.R. Mallory Company. At some point, Kraft Foods Global, Inc., and Dart & Kraft Inc. became involved.[4]

From approximately 1950 to 1963, wastes including "chlorinated solvents (PCE and TCE), acetone, alcohol, waxes, paints[,] phenolic resins, and ceramics" were disposed in an open unlined pit known as Site A, which was located at the plant site in Attica, Indiana. Appellants' Appendix at 1442. From 1963 to 1980, Radio Materials Corporation operated another open unlined waste disposal pit known as Site B and disposed of "waste ceramic, phenolic resin, acetone, alcohol, PCE and TCE." *Id.* at 1442.

In May 1969, the Indiana State Board of Health sent a letter to the general manager of Radio Materials Company,[5] which stated that an inspection at the Attica facility revealed that "overflow from the settling pit contained a considerable amount of Barium Titanate in suspension," and that "[t]his material was later settling out in the roadside ditch...." *Id.* at 1487. In 1972, the Indiana State Board of Health sent a letter to Radio Materials Company which stated that during an inspection, "a situation was discovered which must be corrected." *Id.* at 1489. Specifically, the letter stated that "the 5–gallon buckets used to collect fuel oil leaking from the engine do get accidentally spilled into the pit, resulting in pollution of the creek in Ravine Park." *Id.*

CCC issued a commercial casualty policy to Radio Materials Corporation with a policy period from December 29, 1980 to December 29, 1981. ACC issued three commercial casualty policies to Radio Materials Corporation, which covered the following periods: December 29, 1981 to December 29, 1982; December 29, 1982 to December 29, 1983; and December 29, 1983 to December 29, 1984. The policies provided coverage for "all sums which the insured shall become legally obligated to pay as damages because of A. bodily injury or B. property damage." *Id.* at 1176, 1193, 1215, 1237. Each of the four policies contained the following:

> In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably

---

**3.** The chronological case summary indicates that this case was filed on May 22, 2000. However, the chronological case summary provided in Appellants' Appendix states that it "INCLUDES ENTRIES BETWEEN 08/20/2007 AND 12/10/2008 ONLY." Appellants' Appendix at 10.

**4.** The Plaintiffs state that "on or about January 31, 1979, P.R. Mallory became a wholly owned subsidiary of Dart Industries, Inc." Appellants' Brief at 5. The Plaintiffs cite to their third amended complaint for this proposition. The Plaintiffs also state, without citation to the record, that "[o]n June 12, 1980,

Dart affiliated with Kraft, Inc. to form Dart & Kraft, Inc." *Id.* The Plaintiffs also cite to its complaint to support its statement that "[o]n November 21, 1986, Dart & Kraft, through merger, changed its name to Kraft, Inc., and through a succession of mergers and name changes is currently known as Kraft Foods Global, Inc." *Id.*

**5.** The letter was addressed to the general manager of the Radio Materials Company. The parties do not argue that Radio Materials Company was different from Radio Materials Corporation.

obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

*Id.* at 1173, 1190, 1212, 1234.[6] The policies each defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at 1172, 1189, 1211, 1233. The policies also provided that "[f]or the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." *Id.* at 1177, 1194, 1216, 1238.

On August 14, 1980, Radio Materials Corporation notified the United States Environmental Protection Agency (the "EPA") of its hazardous waste activity and identified itself as a generator of hazardous waste and an owner/operator of a treatment, storage, and/or disposal facility for hazardous waste. In 1986, Radio Materials Corporation completed a Certification Regarding Potential Releases from Solid Waste Management Units, which revealed that pits at the Attica site contained waste products of ceramic capacitor manufacturing processes. Specifically, one pit known as Site A, which was opened in 1950 and closed in 1963, contained "trichloroethylene, acetone, isopropyl alcohol, and phenolic resins." *Id.* at 1435. A pit known as Site B, which was opened in 1963 and closed in 1980, contained "trichloroethy-

lene, perchlorethylene, acetone, isopropyl alcohol, barium titanate and calcium tatanate ceramic sludges and phenolic resins." *Id.*

From 1981 to "1988–1990," Radio Materials Corporation operated an outdoor drum storage area in which wastes were stored in fifty-five gallon drums, which were placed on the bare ground, prior to being shipped off-site for disposal. *Id.* at 1442. "Spills of waste material ... were reported in 1986 and 1989." *Id.* at 1442–1443.

In 1989, the board of directors of Radio Materials Corporation held a meeting, and the minutes for the meeting reveal that one of the directors "said we should notify Dart & Kraft of their potential liability for clean up of hazardous wastes generated and buried underground here during the Mallory years." *Id.* at 1497. That same year, Joseph F. Riley, Jr., the president of Radio Materials Corporation, sent a letter to the general counsel of Kraft Foods Corporation, which stated that "potential environmental pollution problems exist at the plant site in Attica, Indiana." *Id.* at 1516. The letter also stated:

Specific areas of concern include two widely separated landfill sites and numerous underground storage tanks located on land now owned by Radio Materials Corporation and Helen L. Riley and the Joseph F. Riley Estate near Attica, in Fountain County, Indiana. These landfills and underground storage tanks were installed and operated by Radio Materials Company, Div., P.R. Mallory & Co., Inc. between June 1957 and December 1978 while the Company was a wholly owned subsidiary of P.R. Mallory & Co., Inc. All potential envi-

---

**6.** The Plaintiffs state that "[i]t remains unclear whether the 1980–1981 Policy is missing the notice language." Appellants' Brief at 8 n. 10. However, page 1173 of the Appellants'

Appendix, which appears to consist of a part of the 1980–1981 policy contains the language cited above.

ronmental problems at the site will include those mentioned above; however, they may not be limited to them. Those mentioned comprise the extent of knowledge of any such potential problems which may exist at this point in time. This letter is intended only as a notice to you of a potential liability for environmental clean-up costs. It is not to be interpreted as a notice of any action which may now be going on or as intent on the part of Radio Materials Corporation to sue in court for recovery of all or part of any environmental clean-up costs.

*Id.*

In 1991, the board of directors of Radio Materials Corporation held another meeting at which "Mr. Riley . . . discuss[ed] the issue of potential environmental liability and its possible effects on the Company and the Riley family," and that attorneys would be contacted for legal advice. *Id.* at 1509.

In 1992, Joseph F. Riley, Jr., the president of Radio Materials Corporation, sent a letter to Ron Brenda of Metcalf & Eddy regarding an investigation by Metcalf & Eddy, which stated, in part, that contents of the closed dump site "are assumed to be waste ceramic, phenolic resin, acetone/alcohol and possibly perchlorethylene and trichloroethylene." *Id.* at 1285. The letter also stated:

Documented spills and releases:

1. When the area M was being cleaned for closure in 1989, we discovered that there were several areas where a mixture of solder dross and oil had leaked from the drums it was stored in. With IDEM approval, 6″ of soil was excavated from these areas, packed into drums and manifested off site to the S.E.Side Landfill, Indianapolis, IN. as special waste.

2. In 1986 we discovered that 2/3 of a barrel of plating waste had leaked on to the ground in area M. We transferred the remaining material to a good drum, then excavated the surrounding soil filling 2½ drums. This material was later manifested off site.

Over the years there have been numerous small spills or leaks of mostly oil and/or oil-water which have been scooped up, accumulated and later manifested off site.

*Id.* at 1288–1289.

In 1995, Radio Materials Corporation hired CSI Environmental, Inc. to perform an investigation and site characterization. A 1995 report prepared by The Scientific Edge, Inc. and Indiana Engineering & Geological Services Group, Inc. for Radio Materials Corporation and CSI Environmental of Indiana, Inc. indicated that one of the subsurface soil samples "EXCEED[ED] the residential and the non-residential health-based risk criteria or goals for cleanup" and that a water sample "EXCEED[ED] the health-based risk criteria for two compounds, trichloroethene and tetrachloroethene." *Id.* at 1610. The report recommended that "the source or 'hotspot,' . . . be removed and that the effect of its removal be evaluated by subsequent monitoring of the condition of water. . . ." *Id.* at 1611. The report also stated that the "apparent depth of the 'hotspot,'" was "20 to 25 feet." *Id.* The report also stated that "a minimum excavation is approximately sixty feet in diameter and twenty five feet deep." *Id.*

Between November 1995 and February 1996, Radio Materials Corporation initiated an excavation project to remove the majority of the contaminated soil. An expert report dated 2007 and titled "Nature and Causes of Soil and Groundwater Contamination at the Radio Materials Corpo-

ration Site in Attica, Indiana" stated that "[t]he voluntary cleanup of SWMU 5 in 1995/96 was conducted improperly; it knowingly left contamination behind, and it may have accelerated, rather than reduced releases of chlorinated solvents to groundwater." *Id.* at 1445. The report also stated:

> The 1995 investigation report (TSE, 1995) described the highest VOC concentrations occurring at a depth of 20 to 22 feet, and recommended excavation to a depth of 20 to 25 feet around an identified 'hot spot' in the vicinity of SB–3. When the actual removal was conducted, several months later, but by the same team of contractors, soil was removed only to a depth of 20 feet, i.e., shallower than the depth of greatest concentrations. The prudent and appropriate action would have been to excavate beyond where the contamination was thought to exist.

*Id.* at 1449.

In 1997, the Indiana Engineering & Geological Services sent the Indiana Department of Environmental Management and Radio Materials Corporation a letter that stated: "Unfortunately, three (3) of the four (4) [soil] samples obtained from each sampling event showed tetrachloroethene above the 5.0 ì g/Kg standard shown in the plan. The maximum concentration reported from the eight (8) samples collected was 82 ì g/Kg." *Id.* at 1683.

In March 1999, the EPA entered a consent order for Radio Materials Corporation in which the EPA found that there had been a release of hazardous waste into the environment from the Attica facility and Radio Materials agreed to undertake all actions required by the consent order.

In August 2000, the Plaintiffs filed a first amended complaint against CCC and numerous other insurance companies, including "DOE INSURANCE COMPANIES 1–300," for breach of contract or anticipatory breach of contract and declaratory judgment. *Id.* at 2439.[7] The complaint alleged that "Claimants, including U.S. EPA, allege that plaintiffs owned and operated Radio Materials Corporation ... which conducted operations in Attica between June 1957 and 1978, resulting in alleged damages because of property damage and personal injury beginning in or prior to 1956 and extending until at least 1986."[8] *Id.* at 2447.

In January 2002, Kraft Foods North America and a number of insurance companies, including ACC and CCC, entered into a confidential settlement agreement and release.[9] The settlement agreement and release did not include "Radio Materials Corporation (only with respect to CNA Policies issued to Radio Materials Corporation after its divestiture in 1978 covering Claims)." *Id.* at 934–935.

On December 8, 2004, the Plaintiffs filed a third amended complaint[10] for declarato-

---

7. This complaint did not name ACC as a defendant.

8. The complaint referenced a number of policies but did not reference the policy which CCC issued to Radio Materials Corporation with a policy period from December 29, 1980 to December 29, 1981, which is at issue in this case.

9. The confidential settlement agreement stated, "Kraft Foods North America, Inc. ('Kraft') and the CNA insurance companies ('CNA'),

both as defined below, make and enter into this Confidential Settlement Agreement and Release ('Agreement')." Appellants' Appendix at 932. "CNA" was defined in part as "all the CNA insurance companies set forth on Exhibit 'A,'" which listed more than eighty companies, including ACC and CCC. *Id.* at 935.

10. The record appears to contain only the Plaintiffs' first amended complaint and third amended complaint.

ry judgment and breach of contract against ACC, CCC, and "DOE INSURANCE COMPANIES 1–10." [11] *Id.* at 236. Plaintiffs pointed to the three policies issued by ACC to Radio Materials Corporation and one policy issued by CCC to Radio Materials Corporation and sought a:

declaration that defendants are obligated to pay the costs and expenses of investigation and defense, and legal liabilities incurred or paid in connection with claims and demands seeking damages because of property damage, bodily injury, personal injury, or a combination thereof, and alleging various causes of action, including without limitation claims and causes of action such as negligence, trespass, nuisance, interference with use and enjoyment of property, environmental damage, damage to natural resources, and strict liability, arising out of environmental and other damage or injury allegedly caused by or arising out of the ownership or business operations, or both, conducted by "Radio Materials."

*Id.* at 237. Plaintiffs also sought "various other declarations as to their rights under the Liability Insurance Policies, all in accordance with the contractual provisions of these Policies, insuring obligations imposed or implied by law, and the reasonable expectation of the insureds." *Id.* at 237–238.

In January 2005, ACC and CCC filed an answer to the Plaintiffs' third amended complaint in which they asserted fifty-six affirmative defenses including the defense

that ACC and CCC did not receive timely notice.

In May 2007, the Plaintiffs filed a "MOTION FOR PARTIAL SUMMARY JUDGMENT THAT CNA [12] HAS BREACHED ITS DUTY TO DEFEND AND IS ESTOPPED FROM RAISING POLICY DEFENSES." *Id.* at 352. The Plaintiffs argued that there was no factual dispute that the 2000 amended complaint made clear that the lawsuit sought coverage not only under the policies that Plaintiffs were able to specifically identify, but also under all potentially relevant policies because the complaint stated:

To the extent that additional Liability Insurance Policies were issued to other named insureds, or to predecessors, subsidiaries, parents, affiliates or 'other insureds' of one or more of the plaintiffs, this complaint will be amended as appropriate to include such additional insureds and such additional Liability Insurance Policies.

*Id.* at 354. The Plaintiffs also argued that CNA did not respond to the tender of the claims against Radio Materials Company at the Attica site and that CNA was estopped from raising policy defenses on the Attica site because CNA did not defend.

In May 2007, ACC and CCC filed a motion for summary judgment based upon late notice and argued that Plaintiffs were "precluded as a matter of law from pursuing coverage under the four … policies at

---

11. The complaint stated:

Doe Insurance Companies 1 through 10 are insurance companies whose identities are currently unknown to plaintiffs that issued general liability insurance policies (including primary, umbrella and excess insurance policies) to or covering the operations and ownership of Radio Materials and the manufacturing operations in Attica, Indiana. When the true identities of such insurance companies become known

to plaintiffs, this complaint will be amended to identify such defendant insurance companies.
Appellants' Appendix at 245.

12. The Plaintiffs' motion did not define "CNA." On appeal, the Plaintiffs state that ACC and CCC are collectively referred to as CNA and that both are affiliates of the CNA Insurance Group.

issue because [Radio Materials Corporation] failed to provide [ACC and CCC] with reasonable notice of the occurrence, claim and/or suit arising from the environmental conditions existing at the Site." *Id.* at 890.

That same month, ACC and CCC also filed an omnibus motion for summary judgment and partial summary judgment, which requested an entry of summary judgment for other reasons.[13] With respect to late notice, ACC and CCC's omnibus motion stated:

> [ACC and CCC's] Memorandum in Support of Its Motion for Summary Judgment on Late Notice sets forth [ACC and CCC's] arguments relating to late notice and seeks summary judgment based on the failure of [a Radio Materials Corporation] entity to comply with the notice provisions of the policies. If that motion is granted, it will eliminate the need for this Court to consider this motion.

*Id.* at 908.

On February 11, 2008, the trial court issued an order: (1) denying the Plaintiffs'

motion for partial summary judgment; and (2) denying ACC and CCC's motion for summary judgment on late notice.

On April 1, 2008, ACC and CCC filed a motion to reconsider the trial court's February 11, 2008 order denying their motion for summary judgment. That same day, ACC and CCC filed a motion to clarify the trial court's February 11, 2008 order.

On July 17, 2008, the trial court issued an order denying ACC and CCC's omnibus motion for summary judgment and partial summary judgment. The trial court's order stated, in part:

> The court finds that plaintiff is a proper party plaintiff to present the claims it has presented by virtue of its position as being equitably subrogated to the rights of RMC by virtue of the 2002 Remedial Agreement. Kraft is not a volunteer. Kraft has paid the obligations of another, that is of RMC, that should have been paid by RMC. The court further finds that the Remedial Agreement of 2002 is not limited to the 1957 to 1978 time period. The damages which plain-

---

13. Specifically, ACC and CCC argued:

First, even if RMC–Indiana, the entity that entered into the agreement with Kraft, is an insured under the CNA Policies, and/or is a successor to an insured under the CNA Policies (issues which are strongly disputed in this case), Kraft's agreement with RMC–Indiana only allows it to recover under the CNA Policies issued to RMC–Nevada for damages that occurred as a result of P.R. Mallory's ownership of the Radio Materials division (1957–1978). Since the CNA Policies only cover bodily injury or property damage that occurs during their policy periods (1980 to 1984), they do not cover any property damage that occurred between 1957 and 1978. Second, any assumption of liabilities by RMC–Nevada or RMC–Indiana—either through an agreement with P.R. Mallory at the time that the Radio Materials assets were sold to RMC–Nevada, or as the result of an agreement between RMC–Indiana and Kraft—

would be barred by the contractual liability exclusion. Third, the damages that Kraft has claimed (pursuant to its status as "attorney-in-fact") are not recoverable because they are: (1) costs incurred prior to any "tender" of the claim to CNA; (2) costs incurred by Kraft prior to Kraft obtaining rights as "attorney-in-fact"; and (3) costs incurred by Kraft that are unrelated to either the defense of RMC–Nevada or the remediation of RMC–Nevada's liabilities at the Attica site. Moreover, Kraft mischaracterizes the costs for which it seeks recovery as defense costs, when the costs are, in fact, indemnity costs. Finally, to the extent that the CNA Policies are found to provide any coverage for the damages at issue, liability is limited to (1) damages attributable to RMC–Nevada's operations and (2) damages that occurred during the period of the CNA Policies.

Appellants' Appendix at 899–900.

tiffs are entitled to recover are those which occurred to the site during the policy period 1980 to 1984 and which occurred after 1984 to the extent they can be attributed to an occurrence between 1980 and 1984. Those damages which can be attributed to the time period 1957 to 1978 are excluded from coverage under the policy except for damages which can be shown to have occurred to the site during the policy period that may have evolved from or continued from the pre 1978 contamination.

The court further finds that the contractual liability exclusion precludes plaintiff from recovering from defendant claims based on damages that were assumed by RMC as a result of the 1978 Purchase Agreement. Any, as mentioned above, damages to be recovered are limited to the 1980 to 1984 policy period but those damages may include continuing or evolving damages resulting from the pre–1978 contamination and continuing after 1984 evolving from occurrences between 1980 and 1984.

The court further finds that plaintiff can recover pre-tender costs if it can be demonstrated that the incurring of those costs did not prejudice the defendant. The court further finds that plaintiff is not limited to costs incurred after it became attorney-in-fact or agent for RMC because of its standing as attorney-in-fact and agent and its being in a position of being equitably subrogated to RMC's rights to recover.

The court further find [sic] that there is no presumption in Indiana that the costs incurred after the 1999 Consent Order are indemnification costs.

Finally, this court finds that whether costs are defense or indemnity, whether damages and costs can be allocated or apportioned and, if so, how they should be allocated or apportioned are issues to be determined by the trier of fact.

*Id.* at 4462–4463.

That same day, the trial court issued an order granting ACC and CCC's motion for summary judgment based on late notice.[14] The trial court's order stated:

The defendant CNA has filed its Motion for Summary Judgment on Late Notice. The occurrence, that is the contamination that gave rise to the claim of plaintiff, commenced in the 1950s and continued into the 1980s. The form of the continuation included not only additional accumulation of contaminants, but also the migration and spreading of the contaminants in the soil and water. The plaintiff could conceivably have filed a viable claim at any time after the Indiana Department of Environmental Management began investigating the site. Clearly the action on the policies in issue could not have commenced until after the policies had been issued. But the claims were not brought until approximately sixteen (16) years later.

During the years between 1984 and filing the claim against CNA it is clear from the evidence submitted that the officers and employees of RMC knew of the contamination. They met with government officials concerning the condition of the Attica site. They hired consultants to investigate and advise. They hired contractors to proceed with clean up and mitigation of the damage to the site. Addressing the environmental issues was a major source of concern to the RMC officers during that period. No acceptable excuse or reason has been given for failing to notify CNA more promptly following the issuance of the

14. The chronological case summary lists the trial court's order denying ACC and CCC's omnibus motion as the first entry on July 17, 2008.

policies, especially given the continuing nature of the contamination.

Former officers, employees and others knowledgeable of the facts and circumstances concerning the environmental contamination of the Attica site have die d, become blind or hearing impaired or developed other infirmities. Memories have failed. RMC entered into the consent decree. RMC has engaged in various clean up and mitigation efforts, some of which exacerbated the contamination conditions at the site. Throughout the years and the various efforts to address the problems with the site, CNA was precluded from having any ability to participate, to advise, to investigate, to assist in mitigation or to protect itself in any way from continuing, potentially increasing liability.

"The requirement of prompt notice gives the insurer an opportunity to make a timely and adequate investigation of all the circumstances surrounding the accident or loss. This adequate investigation is often frustrated by a delayed notice. Prejudice to the insurance company's ability to prepare an adequate defense can therefore be presumed by an unreasonable delay in notifying the company about the accident or about the filing of the lawsuit." *Miller v. Dilts,* (Ind.1984) 463 N.E.2d 257, 265 cited in *PSI Energy, Inc. v. The Home Insurance Company, et al.* (Ind.App.2004) 801 [N.E.2d] 705, 716[.]

The facts of this case as they bear on the issue of late notice are not in dispute. Nor can the inferences to be drawn from such facts be said to create any genuine issue of material fact. The plaintiff has failed to raise a genuine issue of material fact as to whether CNA has been prejudiced. The court finds, as a matter of law, that notice was given to CNA so late that CNA has been prejudiced as a matter of fact and as a matter of law. Therefore the Court finds that the Motion for Summary Judgment based on Late Notice should be granted.

\* \* \* \* \* \*

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment on Late Notice be and it is hereby granted.

*Id.* at 28–30.

On August 18, 2008, the Plaintiffs filed a motion for reconsideration of the trial court's July 17, 2008 order granting ACC and CCC's motion for summary judgment on late notice. That same day, the Plaintiffs filed an Alternative Motion for Clarification of the Court's July 17, 2008 Order Concerning Late Notice. The Plaintiffs argued that several distinct liabilities had arisen which should be considered separate occurrences, and that the trial court should clarify its July 17, 2008 order to reflect that it did not apply to the new occurrences. On September 2, 2008, ACC and CCC filed a motion for summary denial and/or to strike Plaintiffs' motion for reconsideration and Plaintiffs' motion for clarification.

On November 14, 2008, the trial court entered an order granting ACC and CCC's motion for summary denial of Plaintiffs' motion for reconsideration and motion for clarification and directing the clerk to enter judgment in favor of defendants. The trial court's order stated, in part:

The central question to be addressed in regard to defendants' Motion for Summary Denial is whether the Court's Order of July 17, 2008 constitutes a final judgment on all the issues between the parties.

\* \* \* \* \* \*

In the instant case the defendants' defense of late notice is a complete de-

fense to the plaintiff's complaint for declaratory judgment. By the Court's ruling the Court essentially held that by not complying with the policy provision requiring written notice to be given as soon as practicable and the delay resulting in prejudice to the defendants the plaintiff breached the policy terms by failing to comply with the requirements of the policy. Therefore the plaintiff is precluded from pursuing any claim based on the insurance contracts. The Court finds that the Order of July 17, 2008 clearly addresses the dispositive issue in the case and by ruling on that dispositive issue the order disposes of all the issues as to all the parties remaining in the case. The case being a declaratory action on contract coverage is concluded by the Court's finding that the plaintiff because of the late notice, is precluded from pursuing its declaratory judgment action. Even though the order may lack some of the formalities and the details that are required by the trial rules and other case law, nevertheless the essence of the ruling is that it disposes of all the issues as to all the parties thereby ending the particular case.

Because the Court's Order of July 17, 2008 is a final judgment the plaintiff's Motions for Reconsideration and Clarification are moot. In *[Stephens] v. Irvin,* (Ind.App.2000) 734 N.E.2d 1133, 1135 the Court held "As explained in our earlier opinion, and as emphasized in *Biggs,* [sic] a trial court has inherent power to reconsider any of its previous rulings so long as the action remains *in fieri* ". citing *Biggs v. Marsh* (Ind.App. 1983) 446 N.E.2d [977], [ ] 981. Likewise in *Stewart v. [Kingsley] Terrace Church of Christ Inc.,* (Ind.App.2002) 767 N.E.2d 542, 545 the Court held

"Generally, until a judgment is entered, a trial court can amend, modify, or change an earlier decision". Also in *Wabash Grain Inc. v. Bank One, Crawfordsville, N.A.* (Ind.App.1999) 713 N.E.2d 323, 325 the Court held "We have long held that a trial court has an inherent power to reconsider, vacate, or modify any previous order so long as the case has not proceeded to final judgment." *[Squires] v. Utility/Trailers of Indianapolis, Inc.* (Ind.App.1997) 686 N.E.2d 416, 419. And finally in *McLaughlin v. American Oil* (1979) 181 Ind.App. 356, 391 N.E.2d 864, 865 the court held ". . . this court has previously held that a trial court has inherent power to reconsider, vacate, or modify any previous order, so long as the case has not proceeded to judgment, i.e. the case is still *in fieri* " cites omitted.

Clearly from those cases once the Court has entered a final judgment any Motion to Reconsider or Motion for Clarification is moot. The Court has spoken, the judgment has been rendered and at that point except under a very narrow range of limited circumstances, the Court has no further jurisdiction in the case. Accordingly the Court finds in this case that the plaintiff's motions for clarification and reconsideration of the Court's July 17, 2008 order are moot and the Court has no jurisdiction to consider them.

The Court further finds that the Clerk of the Montgomery Circuit Court should enter a final judgment in favor of the defendants and that the plaintiff take nothing by way of its Complaint for Declaratory Judgment.

*Id.* at 31–35.

The issue is whether the trial court erred by granting ACC and CCC's motion

for summary judgment.[15] Our standard of review for a trial court's grant of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(c); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Mangold*, 756 N.E.2d at 973. Our review of a summary judgment motion is limited to those materials designated to the trial court. *Id.* We must carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. *Id.* at 974.

The fact that the parties made cross-motions for summary judgment does not alter our standard of review. *Hartford Accident & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind.Ct.App.1997), *trans. denied.* Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.* Where a trial court enters findings of fact and conclusions thereon in granting a motion for summary judgment, as the trial court did in this case, the entry of specific findings and conclusions does not alter the nature of our review. *Rice v. Strunk*, 670 N.E.2d 1280, 1283 (Ind.1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. *Id.* They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.*

Before addressing the merits of the Plaintiffs' arguments, we will generally discuss the notice requirement in the insurance context. Notice is a threshold requirement which must be met before an insurer is even aware that a controversy or matter exists which requires the cooperation of the insured. *Miller v. Dilts*, 463 N.E.2d 257, 265 (Ind.1984). "[A]n insurer cannot defend a claim of which it has no knowledge." *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1273 (Ind.2009). "The notice requirement is 'material, and of the essence of the contract.'" *Miller*, 463 N.E.2d at 265 (quoting *London Guarantee & Accident Co. v. Siwy*, 35 Ind.App. 340, 345, 66 N.E. 481, 482 (1903)). "The duty to notify an insurance company of potential liability is a condition precedent to the company's liability to its insured." *Shelter Mut. Ins. Co. v. Barron*, 615 N.E.2d 503, 507 (Ind.Ct. App.1993) (citing *Miller*, 463 N.E.2d 257), *trans. denied.*

"The function of a notice requirement is to supply basic information to permit an insurer to defend a claim." *Dreaded, Inc.*, 904 N.E.2d at 1273. "The requirement of prompt notice gives the insurer an opportunity to make a timely and adequate investigation of all the circumstances surrounding the accident or loss." *Miller*, 463 N.E.2d at 265. "This adequate investigation is often frustrated by a delayed notice." *Id.* "Prejudice to the insurance company's ability to prepare an adequate defense can therefore be presumed by an unreasonable delay in notifying the company about the accident or about the filing of the lawsuit." *Id.* "The injured party can establish some evidence that prejudice did not occur in the particu-

---

**15.** ACC and CCC argue that the Plaintiffs' appeal is untimely and should be dismissed. Even assuming that the Plaintiffs' appeal is timely, we conclude that the trial court prop-
erly granted summary judgment to ACC and CCC. Thus, we do not address ACC and CCC's argument.

lar situation." *Id.* "Once such evidence is introduced, the question becomes one for the trier of fact to determine whether any prejudice actually existed." *Id.* at 265–266. "The insurance carrier in turn can present evidence in support of its claim of prejudice." *Id.* "When the facts of the case are not in dispute, what constitutes reasonable notice is a question of law for the court to decide." *Askren Hub States Pest Control Services, Inc. v. Zurich Ins. Co.,* 721 N.E.2d 270, 278 (Ind.Ct.App. 1999).

We will address: (A) whether the Plaintiffs' notice was late under the terms of the policies; and (B) whether the Plaintiffs rebutted the presumption of prejudice to ACC and CCC.

### A. *Whether Notice Was Late Under the Terms of the Policies*

 The Plaintiffs argue that notice was not late under the terms of the policies. This issue calls upon us to interpret the policies. A contract for insurance is subject to the same rules of interpretation as other contracts. *USA Life One Ins. Co. of Ind. v. Nuckolls,* 682 N.E.2d 534, 537–538 (Ind.1997). Thus, if the language in the insurance policy is clear and unambiguous, it should be given its plain and ordinary meaning. *Id.* at 538. However, if the language of the policy is ambiguous, we may apply the rules of construction in interpreting the language. *Id.* When an insurance policy contains an ambiguity, it should be strictly construed against the insurance company. *Id.* A policy is ambiguous only if it is "susceptible to more than one interpretation and reasonably intelligent persons would differ as to its meaning." *Id.*

In general, the Plaintiffs argue that no notice requirement was triggered because an occurrence had not yet occurred. The policies stated:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

A. bodily injury or

B. property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Appellants' Appendix at 1176, 1193, 1215, 1237. The policies stated that the insurance did not apply to "property owned or occupied or rented to the insured." *Id.* at 1176, 1193, 1215, 1237. The policies defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at 1172, 1189, 1211, 1233. The policies define "bodily injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." *Id.* at 1171, 1188, 1210, 1232. The policies define "property damage" as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is

caused by an occurrence during the policy period." *Id.* at 1172, 1189, 1211, 1233.

Each of the policies contained the following provision:

4. Insured's Duties in the Event of Occurrence, Claim or Suit

(a) *In the event of an occurrence,* written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents *as soon as practicable.*

(b) *If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.*

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

*Id.* at 1173, 1190, 1212, 1234 (emphasis added).

The Plaintiffs argue that "[t]aking the Policy language together and collapsing the definitions, the ... Policies require notice only when the insured becomes aware of 'an accident ... resulting in ... physical injury to ... tangible property [not owned by Radio Materials] ... during [1980–1984].' "[16] Appellants' Brief at 23. The Plaintiffs argue that "Radio Materials' duty to provide notice did not arise until Radio Materials subjectively became aware of property damage taking place during the 1980–1984 time period." *Id.* The Plaintiffs also argue that there are no facts in ACC and CCC's summary judgment submissions "or the Court's July 17, 2008 Order indicating when Radio Materials became aware of an 'occurrence'—and 'accident ... which results in ... physical injury to ... tangible property [not owned by Radio Materials] which occurs during ... 1980–1984.' "[17] *Id.* at 24. The Plaintiffs argue that none of the events triggered a notice obligation under the polices because there was no notice that an occurrence had taken place.

ACC and CCC argue that

[t]he question on ACC and CCC's late notice motion was whether between 1980 (the first year of coverage with CCC) to the first date of notice to ACC and CCC in 2003 (or even 2000, as alleged by Kraft), [Radio Materials Corporation] had any knowledge of an accident, including continuous or repeated exposure to conditions, that potentially could involve property damage to third-party property occurring during the ACC and CCC policy periods.

Appellees' Brief at 33.

▇▇▇ Before examining the designated evidence, we note that Indiana courts have

---

**16.** Bracketed text and ellipses appear in original.

**17.** Bracketed text appears in original.

interpreted the phrase "as soon as practicable" to require "reasonable notice." *Askren Hub States Pest Control Services, Inc. v. Zurich Ins. Co.,* 721 N.E.2d 270, 278 n. 7 (Ind.Ct.App.1999) (citing *Hartford Accident & Indem. Co., Hartford, Conn. v. Armstrong,* 125 Ind.App. 606, 613, 127 N.E.2d 347, 350 (1955)). When the facts of the case are not in dispute, what constitutes reasonable notice is a question of law for the court to decide. *Shelter Mut. Ins. Co.,* 615 N.E.2d at 507.

The designated evidence reveals that from approximately 1950 to 1963, wastes were disposed in an open unlined pit located at the Attica site. From 1963 to 1980, Radio Materials Corporation operated another open unlined waste disposal pit and disposed of "waste ceramic, phenolic resin, acetone, alcohol, PCE and TCE." Appellants' Appendix at 1442. In May 1969, the Indiana State Board of Health sent a letter to the general manager of Radio Materials Company, which stated that an inspection at the Attica facility revealed that "overflow from the settling pit contained a considerable amount of Barium Titanate in suspension," and that "[t]his material was later settling out in the roadside ditch...." *Id.* at 1487. In 1972, the Indiana State Board of Health sent a letter to Radio Materials Company which stated that "the 5-gallon buckets used to collect fuel oil leaking from the engine do get accidently spilled into the pit, resulting in pollution of the creek in Ravine Park." *Id.* at 1489.

On August 14, 1980, Radio Materials Corporation notified the EPA of its hazardous waste activity and identified itself as a generator of hazardous waste and an owner/operator of a treatment, storage, and/or disposal facility for hazardous waste. In 1986, Radio Materials Corporation completed a Certification Regarding Potential Releases from Solid Waste Management Units, which revealed that pits at the Attica site contained waste products of ceramic capacitor manufacturing processes.

From 1981 to "1988–1990," Radio Materials Corporation operated an outdoor drum storage area in which wastes were stored in fifty-five gallon drums, which were placed on the bare ground, prior to being shipped off-site for disposal. *Id.* at 1442. "Spills of waste material ... were reported in 1986 and 1989." *Id.* at 1442–1443.

In 1989, the board of directors of Radio Materials Corporation held a meeting, and the minutes for the meeting reveal that Dart & Kraft should be notified "of their potential liability for clean up of hazardous wastes generated and buried underground here during the Mallory years." *Id.* at 1497. That same year, the president of Radio Materials Corporation, sent a letter to the general counsel of Kraft Foods Corporation, which stated that "potential environmental pollution problems exist at the plant site in Attica, Indiana." *Id.* at 1516.

In 1991, the board of directors of Radio Materials Corporation held a meeting and discussed "the issue of potential environmental liability and its possible effects on the Company and the Riley family" and that attorneys would be contacted for legal advice. *Id.* at 1509.

In 1992, the president of Radio Materials Corporation sent a letter to Ron Brenda of Metcalf & Eddy regarding an investigation by Metcalf & Eddy, which stated, in part, that contents of the closed dump site "are assumed to be waste ceramic, phenolic resin, acetone/alcohol and possibly perchlorethylene and trichloroethylene." *Id.* at 1285. The letter also stated:

Documented spills and releases:

1. When the area M was being cleaned for closure in 1989, we discovered

that there were several areas where a mixture of solder dross and oil had leaked from the drums it was stored in. With IDEM approval, 6″ of soil was excavated from these areas, packed into drums and manifested off site to the S.E.Side Landfill, Indianapolis, IN. as special waste.

2. In 1986 we discovered that 2/3 of a barrel of plating waste had leaked on to the ground in area M. We transferred the remaining material to a good drum, then excavated the surrounding soil filling 2½ drums. This material was later manifested off site.

Over the years there have been numerous small spills or leaks of mostly oil and/or oil-water which have been scooped up, accumulated and later manifested off site.

*Id.* at 1288–1289.

In 1995, Radio Materials Corporation hired CSI Environmental, Inc. to perform an initial investigation and site characterization. A 1995 report prepared by The Scientific Edge, Inc. and Indiana Engineering & Geological Services Group, Inc. for Radio Materials Corporation and CSI Environmental of Indiana, Inc. indicated that one of the subsurface soil samples "EXCEED [ED] the residential and the non-residential health-based risk criteria or goals for cleanup" and that a water sample "EXCEED[ED] the health-based risk criteria for two compounds, trichloroethene and tetrachloroethene." *Id.* at 1610. The report recommended that "the source or 'hotspot,' ... be removed and that the effect of its removal be evaluated by subsequent monitoring of the condition of water...." *Id.* at 1611. The report stated that the "apparent depth of the 'hotspot," was "a depth of 20 to 25 feet." *Id.* The report also stated that "a minimum excavation is approximately sixty

feet in diameter and twenty five feet deep." *Id.*

Between November 1995 and February 1996, Radio Materials Corporation initiated an excavation project to remove the majority of the contaminated soil. An expert report titled "Nature and Causes of Soil and Groundwater Contamination at the Radio Materials Corporation Site in Attica, Indiana" stated that "[t]he voluntary cleanup of SWMU 5 in 1995/96 was conducted improperly; it knowingly left contamination behind, and it may have accelerated, rather than reduced releases of chlorinated solvents to groundwater." *Id.* at 1445. The report also stated:

The 1995 investigation report (TSE, 1995) described the highest VOC concentrations occurring at a depth of 20 to 22 feet, and recommended excavation to a depth of 20 to 25 feet around an identified 'hot spot' in the vicinity of SB–3. When the actual removal was conducted, several months later, but by the same team of contractors, soil was removed only to a depth of 20 feet, i.e., shallower than the depth of greatest concentrations. The prudent and appropriate action would have been to excavate beyond where the contamination was thought to exist.

*Id.* at 1449.

In 1997, the Indiana Engineering & Geological Services sent the Indiana Department of Environmental Management and Radio Materials Corporation a letter that stated: "Unfortunately, three (3) of the four (4) [soil] samples obtained from each sampling event showed tetrachloroethene above the 5.0 μg/Kg standard shown in the plan. The maximum concentration reported from the eight (8) samples collected was 82 μg/Kg." *Id.* at 1683.

In March 1999, the EPA entered a consent order for Radio Materials Corporation in which the EPA found that there

had been a release of hazardous waste into the environment from the Attica facility and Radio Materials agreed to undertake all actions required by the consent order.

■■■ The parties disagree as to when notice was given. The Plaintiffs argue that notice was given to ACC and CCC on August 29, 2000 "when Radio Materials filed an Amended Complaint for Declaratory Judgment and Breach of Contract." Appellants' Brief at 8. In their brief, ACC and CCC state that notice was not given until 2003. Even assuming that notice was given in 2000, we conclude that such notice was late.

Based upon the designated evidence, we conclude that the Plaintiffs had knowledge of an occurrence before they notified ACC and CCC and that the Plaintiffs' delay in notifying ACC and CCC of the occurrence constituted unreasonably late notice. *See Miller*, 463 N.E.2d at 266 (holding that summary judgment be entered in favor of three insurance companies which received notice of the accidents giving rise to liability one month, six months, and seven months after their occurrence and which received notice of the resulting lawsuits as early as five days after the suits were filed); *Askren*, 721 N.E.2d at 278–279 (concluding that the insured's delay of six months before notifying the insurer of the occurrence constituted unreasonable notice). Because we have determined that the Plaintiffs failed to give ACC and CCC reasonable notice, we must now determine whether ACC and CCC were prejudiced by the unreasonable delay. *See Askren*, 721 N.E.2d at 279 (holding that the in-

sured's failure to give reasonable notice would not bar recovery under the policy unless the insurer suffered prejudice as a result of the delay).

## B. *Prejudice*

We next address whether the Plaintiffs designated some evidence that prejudice did not occur. "Although prejudice is presumed upon the showing of an unreasonable delay in notifying the company of the accident or the filing of the lawsuit, the presumption may be rebutted by evidence that prejudice did not actually occur." *Shelter Mut. Ins. Co.*, 615 N.E.2d at 507 (citing *Miller*, 463 N.E.2d at 265–266). "Once such evidence is introduced, the question becomes one for the trier of fact to determine whether any prejudice actually existed." *Miller*, 463 N.E.2d at 265–266.

### 1. *Effect of ACC and CCC's Statements that the Plaintiffs Were Not Entitled to Coverage*

■■■ We first address the Plaintiffs' argument that *Tri–Etch, Inc. v. Cincinnati Ins. Co.*, 891 N.E.2d 563 (Ind.Ct.App.2008), impacts this discussion and requires reconsideration of the July 17, 2008 order. In that case, another panel of this court held that an insurer could not show prejudice as a matter of law by allegedly late notice when the insurer consistently maintained that the insured was not entitled to coverage. 891 N.E.2d at 570–573. On January 8, 2009, the Indiana Supreme Court granted transfer.[18]

---

18. The Plaintiffs cited *Tri–Etch, Inc. v. Cincinnati Ins. Co.*, 891 N.E.2d 563 (Ind.Ct.App. 2008), without indicating that transfer was granted. Once a Court of Appeals' opinion has been vacated, it may not be cited as law. *Hubbard v. Hubbard*, 690 N.E.2d 1219, 1221 n. 2 (Ind.Ct.App.1998); *see also* Ind. Appellate Rule 58(A) (stating that when transfer is

granted by the Indiana Supreme Court, the opinion is vacated except those portions that are expressly adopted or summarily affirmed). We remind the Plaintiffs' counsel of their duty of candor toward the tribunal under Indiana Professional Conduct Rule 3.3 and their responsibility to carefully check all citations for precedential value.

On transfer, the Indiana Supreme Court held that while a finding of prejudice is required to void coverage, late notice was presumptively prejudicial to an insurer. *Tri–Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1005 (Ind.2009) (citing *Miller*, 463 N.E.2d 257), *reh'g denied*, The Court also held that "standing alone, the fact that an insurer also denies coverage on other issues does not preclude the insurer from raising failure to give timely notice of a claim, and does not conclusively rebut the presumption that untimely notice of a claim prejudices the insurer." *Id.* at 999. Specifically, the Court stated:

> The Court of Appeals followed *Miller*, but reasoned that [the insurer] was not prejudiced by late notice as a matter of law because it "consistently maintained that Tri–Etch is not entitled to coverage under either of its policies for the claim resulting from Young's death." *Tri–Etch v. Cincinnati Ins. Co.*, 891 N.E.2d 563, 572 (Ind.Ct.App.2008). We do not agree that an insurer's denial of coverage on other grounds as a matter of law rebuts the presumption of prejudice from late notice existing under *Miller*. There is no reason why an insurer should be required to forego a notice requirement simply because it has other valid defenses to coverage. If there is no prejudice to the insurer from lack of notice, the absence of prejudice does not arise from the insurer's taking the position that it also has other valid defenses to coverage. Rather, it arises from the insurer's taking no action with respect to the claim because of its other defenses. Even if an insurer consistently denies coverage, timely notice gives the insurer an opportunity to investigate while evidence is fresh, evaluate the claim, and participate in early settlement. The fact that an insurer asserts other coverage defenses does not render these opportunities meaningless. It is a fact issue whether the other defenses would have caused the insurer, if given timely notice, to do nothing with respect to the claim.

*Id.* at 1005.

■ Based upon the Indiana Supreme Court's holding in *Tri–Etch*, we conclude that the fact that ACC and CCC maintained that there was no coverage based upon other grounds does not preclude ACC and CCC from raising the Plaintiffs' failure to give timely notice and does not conclusively rebut the presumption that untimely notice of a claim prejudiced them as insurers.

### 2. *Whether the Plaintiffs Rebutted the Presumption of Prejudice*

■ On appeal, the Plaintiffs argued that they "presented myriad evidence showing that [ACC and CCC's] claims of prejudice are merit less because Radio Materials adequately safeguarded [ACC and CCC's] interests and [ACC and CCC] presented no evidence that it would have acted differently." Appellants' Brief at 29. The Plaintiffs cite to a portion of a deposition of Thomas Barriball, which according to the table of contents in the Appellants' Appendix, appeared to be an exhibit that was attached to the Plaintiffs' "MOTION FOR PARTIAL SUMMARY JUDGMENT THAT CNA HAS BREACHED ITS DUTY TO DEFEND AND IS ESTOPPED FROM RAISING POLICY DEFENSES." Appellants' Appendix at 352. Specifically, the Plaintiffs cite to portions of pages 72, 195, 202, 206, 207, 213, 214, 217, 218, 219, 220, and 226 of a 232–page deposition. However, the portions of the deposition cited by the Plaintiffs were not specifically designated in either its motion for partial summary judgment or its memorandum in opposition to ACC and CCC's motion for summary judgment on late no-

tice.[19] Because the portion of the deposition relied upon by the Plaintiffs on appeal was not properly designated to the trial court, we cannot consider such evidence. *See Filip v. Block,* 879 N.E.2d 1076, 1081 (Ind.2008) (holding that "Trial Rule 56(C) does compel parties to identify the 'parts' of any document upon which they rely," and that "[t]he Rule thus requires sufficient specificity to identify the relevant portions of a document, and so, for example, the designation of an entire deposition is inadequate."), *reh'g denied; Rosi v. Business Furniture Corp.,* 615 N.E.2d 431, 434 (Ind.1993) (holding that appellate courts are prohibited from "reversing summary judgment orders on the ground that there is a genuine issue of material fact unless the material facts and relevant evidence were *specifically designated to* the trial court").[20]

▇▇▇ The Plaintiffs argue that ACC and CCC's *"own expert* praised the investigatory and remedial work being performed at the Attica Site by the environmental consultant hired subsequent to notice to CNA." Appellants' Brief at 34. The Plaintiffs cite to one line in a deposition, which states, "I believe that they are doing a thorough and very professional site investigation...." Appellants' Appendix at 3025. The Plaintiffs suggest that the "they" in the previous statement refers to CRA, which, according to the Plaintiffs' memorandum in opposition to ACC and CCC's motion for summary judgment on late notice, was a consulting firm that was retained by Radio Materials after ACC and CCC were notified of the claims concerning the Attica site. Even assuming that this statement came from ACC and CCC's expert and the statement refers to CRA, we cannot say that this statement regarding the performance of a consulting firm hired years after the pollution and after ACC and CCC were notified constitutes evidence that prejudice did not occur.

The Plaintiffs also argue that ACC and CCC did not show actual prejudice. Specifically, the Plaintiffs argue that: (a) assertions that potential witnesses have died are legally insufficient to establish actual prejudice; and (b) ACC and CCC's failure to participate in the defense and investigation does not equate to actual prejudice. However, as previously discussed, the

---

19. The deposition was also not designated in ACC and CCC's motion for summary judgment on late notice or in ACC and CCC's reply in further support of their motion for summary judgment on late notice.

20. We also note that the Plaintiffs did not submit a separate designation of evidence. In *Filip v. Block,* the Indiana Supreme Court held that a party's designation of evidence may be placed in a motion for summary judgment, a memorandum supporting or opposing the motion, a separate filing identifying itself as the designation of evidence, or an appendix to the motion or memorandum. 879 N.E.2d 1076, 1081 (Ind.2008). However, the Court also emphasized that "[t]he only requirement as to placement is that the designation clearly identify listed materials as designated evidence in support of or opposition to the motion for summary judgment." *Id.* Also, "[i]f the designation is not in the motion itself, it must be in a paper filed with the motion, and the motion should recite where the designation of evidence is to be found in the accompanying papers." *Id.* Here, the Plaintiffs' motion for partial summary judgment did not "recite where the designation of evidence is to be found in the accompanying papers." *Id.* Nor did the Plaintiffs' memorandum in opposition to ACC and CCC's motion for summary judgment on late notice recite where the designation of evidence was to be found. We remind the Plaintiffs that the Indiana Supreme Court also held that "the courts and opposing parties should not be required to flip from one document to another to identify the evidence a party claims is relevant to its motion." *Id.* "Rather, the entire designation must be in a single place, whether as a separate document or appendix or as a part of a motion or other filing." *Id.*

Plaintiffs bear the burden of rebutting the presumption of prejudice. *See Miller*, 463 N.E.2d at 265–266. We conclude that the Plaintiffs did not provide evidence to rebut the presumption of prejudice as a matter of law.[21] *See Askren*, 721 N.E.2d at 280 (holding that the insured did not provide sufficient evidence to rebut the presumption of prejudice as a matter of law).

For the foregoing reasons, we affirm the trial court's grant of summary judgment to ACC and CCC.

Affirmed.

BAILEY, J., concurs.

NAJAM, J., concurs in result.

NAJAM, Judge, concurring in result.

The central issue in this appeal is whether two insurance companies ("the insurers") have a duty to defend Radio Materials Corporation ("RMC") under policies issued between December 29, 1980, and December 29, 1984 ("the policies"). The majority affirms the trial court's grant of summary judgment to the insurers on the rationale that RMC gave the insurers unreasonably late notice of occurrences purportedly covered by the policies. I concur in the result reached by the majority, but I respectfully disagree with the majority's rationale in reaching that result. The disposition of this case does not turn on whether RMC satisfied the notice requirement by giving notice "as soon as practicable" or by giving "reasonable notice" under the policies, but on whether there was an "occurrence" during the policy period. Considering the policies and the designated evidence, RMC has shown no evidence of property damage to non-owned property during the policy period and, therefore, no occurrence took place that could suggest coverage. Therefore, the insurers have no duty to defend RMC.

The timeline of the most relevant events[22] is as follows:
- 1950–1963: RMC dumps waste at "Site A," which is on property owned by RMC in Attica, Indiana;

---

**21.** The Plaintiffs argue that "the liabilities facing Radio Materials are the result of several 'occurrences,' some of which are ongoing and, in some instances, some which may lead to additional liabilities in the future." Appellants' Brief at 36. The Plaintiffs point to three occurrences that have allegedly occurred recently which involved the Attica City water well, EPA directives, and homeowners' claims. *See* Appellants' Brief at 37–39. The Plaintiffs did not reference these claims until their Alternative Motion for Clarification of the Court's July 17, 2008 Order Concerning Late Notice, which was dated August 18, 2008. On appeal, the Plaintiffs argue that the July 17, 2008 order "should be reversed to preclude summary judgment for Radio Materials' liabilities at the Attica Site that postdate the date on which [ACC and CCC] received notice." Appellants' Brief at 45. ACC and CCC argue that any additional claims stem from the same occurrence. We agree. The claims involving the Attica City water well, EPA directives, and homeowners' claims refer to contamination. We have already concluded that the Plaintiffs had knowledge of the occurrence before they notified ACC and CCC and that the Plaintiffs' delay in notifying ACC and CCC of the occurrence constitutes unreasonable notice. The Plaintiffs argue that the policies were drafted on a per occurrence basis. However, we note that the policies stated that "[f]or the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." Appellants' Appendix at 1177, 1194, 1216, 1238. We cannot say that the trial court's July 17, 2008 order should be reversed to preclude summary judgment for ACC and CCC regarding the Attica City water well, EPA directives, and homeowners' claims.

**22.** These facts are detailed in the insurers' brief, with citations to the appendices. RMC has not challenged the insurers' recitation of these particular facts on appeal.

- 1963–August of 1980: RMC dumps waste at "Site B," which is on property owned by RMC in Attica;

- 1995–1996: RMC learns of extensive contamination at its Attica site (which, again, it owns) and begins on-site cleanup, during which RMC learns that it has contaminated groundwater;

- March of 1999: EPA finds "a release of hazardous waste into the environment from the Attica facility";

- August of 2000: RMC files suit against multiple insurance companies, including the parent company of two insurers at issue here.

*See* Appellees' Brief at 7 (citing to the appendix).

The policies defined the relevant terms as follows:

- "Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended...."

- "Property damage" is defined as "(1) physical injury to or destruction of ... property which occurs during the policy period ... or (2) loss of use ... provided such loss ... is caused by an occurrence during the policy period."

- Excluded from coverage is "property damage to (1) property owned or occupied by ... the insured," RMC.

- "Notice" is required as follows: "In the event of an occurrence, written notice containing ... reasonably obtainable information with respect to the time, place, and circumstances thereof ... shall be given ... as soon as practicable."

*See, e.g.,* Appellants' App. at 1172–73, 1176. The defined terms in the policy must be read together and harmonized. *See Van Prooyen Builders, Inc. v. Lambert,* 907 N.E.2d 1032, 1034–35 (Ind.Ct.App.2009), *trans. denied.*

Thus, of course, there must be an occurrence before notice is required. And an occurrence means damage to non-owned property. At first, the policy language is unclear on when the damage to non-owned property must happen. On the one hand, subsection (2) of the definition of "property damage" says that the damage must be caused by an "occurrence during the policy period." That language suggests that only the contamination itself—not the property damage—must occur during the policy period. This is the interpretation assumed by the trial court and by the majority. Under this interpretation, RMC had a duty to contact its insurers "as soon as practicable" after RMC learned that it had contaminated its own land, to protect against the possibility that the insured's contaminated land might damage nearby, non-owned property at some indefinite time in the future.

But that interpretation is untenable for at least two reasons. First, the facts establish that RMC intentionally buried contaminants on its own land well before the first policy was issued in December of 1980. Thus, RMC would have had to provide notice to the insurers immediately after RMC entered into its policies in order to preserve coverage (assuming coverage would apply in this scenario). Second, and more significantly, this interpretation would require notice of contamination that does not result in third-party property damage, which is contrary to the policy's definition of an occurrence, which, again, is the only prerequisite to notice.

But subsection (1) of the definition of "property damage" clearly states *when* the damage to non-owned property must occur: *"physical injury* to or destruction of ... [non-owned] property *which occurs during the policy period* ...." That is, the damage to non-owned property—not the accident itself—must have happened during the policy period, i.e., sometime be-

tween December of 1980 and December of 1984. On appeal, RMC advocates for this reading of the policies. *See* Appellants' Brief at 23–24. I agree that this interpretation is the only reasonable interpretation of what constitutes an occurrence that would give rise to the notice requirement.

Thus, I agree with RMC's interpretation of the policies. Only third-party property damage triggers coverage. As such, an occurrence requires actual—not possible—off-site contamination during the policy period. Accordingly, RMC's duty to notify the insurers arose when RMC first learned of actual third-party property damage due to off-site contamination, which was the position taken by RMC at oral argument.

That said, RMC has not demonstrated that *any* third-party property damage originated during the policy period. RMC repeatedly asserts that it is currently being sued by third parties for, among other things, property damage. But RMC has not included copies of those complaints in its voluminous appendices. Nor has RMC included any environmental studies of non-owned property that either (1) indicate actual property damage to non-owned property or (2) demonstrate a nexus between any alleged damage and the policy period. To the contrary, RMC has designated no evidence that, *during the policy period,* December of 1980 to December of 1984, there was *any* damage to non-owned property. Thus, under the plain language of the policies, RMC is not entitled to coverage.

Of course, the question in this appeal is not whether RMC is entitled to coverage, but whether the insurers have breached their duty to defend RMC from the third-party lawsuits claiming property damage. As this court has held, "the duty to defend … arises before all the facts can be determined at trial. [A]n insurer [must] examine the allegations of the complaint and make a reasonably complete investigation of the facts [ ] before it can deny coverage and consequent defense." *Am. States Ins. Co. v. Aetna Life & Cas. Co.,* 177 Ind.App. 299, 379 N.E.2d 510, 518 (Ind.Ct.App. 1978). RMC relies on the threshold nature of the duty to defend to criticize the insurers for "mislead[ing] the [t]rial [c]ourt by arguing only that [RMC] was aware of some very general conditions at the Attica Site without establishing when any 'property damage' actually occurred." Appellants' Brief at 24. In effect, RMC contends that the pending third-party actions, which are the first indication of actual, third-party property damage due to off-site contamination, relate back to the policy period.

In a coverage case, it is incumbent on the insured to present facts that indicate coverage. As we have held, where the facts alleged by an insured (and summary judgment nonmovant) reveal no circumstances that would indicate coverage, the insurer can "not be held to have been required to defend" the insured from third-party actions. *Am. States Ins. Co.,* 379 N.E.2d at 518. Here, there is no evidence regarding when or for how long the contaminants had migrated off-site, and there is no evidence of actual third-party property damage between December of 1980 and December of 1984. More is required than the allegation that RMC is being sued by third parties for property damage. *See* Ind. Appellate Rule 46(A)(8)(a). Where, as here, there are no circumstances that would indicate coverage, the insurers cannot be required to defend RMC against the pending third-party actions.

Accordingly, for these reasons I concur in the result reached by the majority in favor of the insurers.